**UNITED STATES of America, Petitioner,**

v.

**Vytautas GECAS, Respondent.**

No. 93–50179–RV.
Misc. No. 1/8313–92–01.

United States District Court,
N.D. Florida,
Panama City Division.

Aug. 11, 1993.

Special Investigations, U.S. Dept. of Justice, Washington, DC, for U.S.

Ivars Berzins, Ivars Berzins, P.A., Babylon, NY, pro hac vice, for Vytautas Gecas.

### ORDER

VINSON, District Judge.

Pending is the United States' petition to enforce its administrative subpoena. (Doc. 2) For the reasons set out below, that petition is GRANTED.

### I. BACKGROUND

Respondent, Vytautas Gecas, is a resident alien living in Sunny Hills, Florida. Documents from his Immigration and Naturalization Service file show that he was born on September 25, 1922, in Naumiestis, Taurage Province, Lithuania. Gecas entered the United States on October 23, 1962, pursuant to Section 221 of the Immigration and Nationalization Act of 1952 [8 U.S.C. § 1201].

In connection with his immigration to the United States, Gecas stated in his application for an Immigrant Visa that, during the years 1938 through 1944, he was a "pupil" in Lithuania. Gecas swore that this information was true. The petitioner now claims to have evidence that, during this period, Gecas, in fact, assisted the Nazi forces then occupying Lithuania, and that he participated in the persecution of persons because of their race, religion, and/or political opinion. Had this information been known to petitioner at the time of Gecas's immigration, he would have been disqualified from entering the United States. In furtherance of its investigation into Gecas's wartime activities, the petitioner, through its Office of Special Investigations ("OSI"), issued an administrative subpoena commanding Gecas to give testimony and to produce documents relating both to his immigration to the United States, and to his activities in Europe between 1940 and 1945.[1]

E. Bryan Wilson, Asst. U.S. Atty., Department of Justice, U.S. Atty. Office, Tallahassee, FL, Robert G. Seasonwein, Office of

---

1. The OSI subpoena requested the following documents:

 You are further commanded to bring with you the following documents: All documents and photographs (whether originals or copies) in your possession or under your control which concern your date and place of birth, your whereabouts and activities in Europe (including but not limited to 1940–45), your immigration to and residence in the United States.

 Administratively, the OSI is housed within the Criminal Division of the Department of Justice. It was created by the Attorney General, pursuant

On September 12, 1991, Gecas and his attorney appeared before OSI investigators in Tallahassee, Florida. After being placed under oath, Gecas provided his name and current and immediate past addresses. He also produced his alien registration card, No. A12 950 903, for inspection. Gecas then refused both to answer all other questions and to produce the documents described in the subpoena.

The questions Gecas refused to answer fall into three general categories. The first category consists of questions directed at eliciting general biographical information, such as his date of birth, various places of residence during the war years, and questions relating to the information contained in his application for and immigration visa. Questions asking Gecas to identify copies of his immigration documents also fall into this category. The second category consists of questions relating to Gecas's association with various organizations, their publications, and their individual members during the period 1940–1945. This category also includes questions relating to his military service. The third category is related to the second, and includes questions dealing with Gecas's knowledge relative to the treatment of Jews in Lithuania after the Nazi occupation.

Gecas does not challenge the validity of the administrative subpoena. Nor does he argue that OSI is without the power to issue such subpoenas. Finally, it is undisputed that, although he faces the possibility of deportation, Gecas faces no threat of criminal prosecution in the United States. His only complaint is that his answers to the investigator's questions, along with the production of the requested documents, would expose him to possible criminal prosecution in a foreign country. Gecas argues that the Fifth Amendment to the Constitution of the United States protects him from such compelled self-incrimination.

In its motion to compel, petitioner argues that fear of incrimination under foreign law is not sufficient to invoke the protections of the Fifth Amendment. In the alternative, petitioner contends that Gecas has failed to show that the danger of foreign prosecution is real and substantial enough to trigger the Fifth Amendment privilege against self incrimination. Finally, the government contends that, by voluntarily responding to the questions contained in the application for an Immigrant Visa, Gecas has waived any Fifth Amendment right to refuse to answer questions relating to his previous immigration. Accordingly, petitioner requests that I compel Gecas to comply with the OSI subpoena.

As set out below, I find that Gecas does in fact face a real and substantial danger of foreign prosecution. However, because I also conclude that the Fifth Amendment privilege does not protect against fear of incrimination under foreign law, I need not reach the question of waiver.

## II. ANALYSIS

 The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself...." From the outset, I want to make it clear that this case does *not* involve the extraterritorial application of this privilege. The Fifth Amendment has never been interpreted to have extraterritorial reach. *See Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). Rather, the question in this case is whether the privilege against compelled self incrimination prevents agents of the federal government from forcing a witness in a civil proceeding in the United States to give testimony, in the United States, that cannot lead to criminal prosecution in this country, but which might expose the witness to criminal prosecution under the laws of a foreign sovereign.

to Order Number 851–79, on September 4, 1979. It has primary responsibility for
> detecting, investigating, and, where appropriate, taking legal action to deport, denaturalize, or prosecute any individual who was admitted as an alien into or became a naturalized citizen of the United States and who had assisted the Nazis by persecuting any person because of

race, religion, national origin, or political opinion.
Order of the Attorney General, No. 851–79, September 4, 1979.
Pursuant to this mandate, OSI is empowered to conduct questioning and to issue subpoenas requiring both testimony and the production of documents.

## A. Fear of Foreign Prosecution.

Neither the Supreme Court of the United States, nor the Eleventh Circuit, has ruled on whether a fear of incrimination under foreign law is within the scope of the Fifth Amendment privilege against self incrimination. *See, e.g., Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972); *In re Application of President's Comm'n on Crime*, 763 F.2d 1191, 1198 (11th Cir.1985). In *Zicarelli, supra*, the Supreme Court noted probable jurisdiction to consider a witness's claim that a grant of immunity cannot supplant the Fifth Amendment privilege with respect to an individual who has a real and substantial fear of foreign prosecution, but expressly declined to reach the constitutional issue. Instead, it assumed for the sake of its analysis that the fear of incrimination under foreign law was within the scope of the privilege, but held that the petitioner had failed to meet his burden under the Fifth Amendment of showing that the danger of incrimination was real and substantial as opposed to speculative or imaginary. *Id.* at 478, 92 S.Ct. at 1675, 32 L.Ed.2d at 240. *See also Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889, 901 (1968); *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 817, 95 L.Ed. 1118, 1123 (1951).

 Such danger must be judged with reference to the ordinary operation of the law in the ordinary courts, and not to some "extraordinary and barely possible contingency, so improbable that no reasonable man would suffer it to influence his conduct." *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 63 n. 8, 84 S.Ct. 1594, 1601 n. 8, 12 L.Ed.2d 678, 686 n. 8 (1964) (*citing Brown v. Walker*, 161 U.S. 591, 608, 16 S.Ct. 644, 651, 40 L.Ed. 819, 825 (1895) (*citing Queen v. Boyes*, 1 B & S 311)). Moreover, it is not the witness's opinion that establishes the hazard of incrimination. Rather, "[i]t is for the court to say whether his silence is justified ... and to require him to answer if it clearly appears to the court that he is mistaken." *Hoffman, supra*, 341 U.S. at 486, 71 S.Ct. at 817, 95

L.Ed. at 1123 (citation omitted). In putting the witness to his burden, the court must be careful not to force the witness to surrender the very protection which the privilege is designed to guarantee. Therefore, the witness need not meet any of the traditional standards of proof (i.e. preponderance of the evidence, clear and convincing evidence and proof beyond a reasonable doubt).

Instead, the witness's burden is minimal. To sustain the privilege

> it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.

*Hoffman v. United States*, 341 U.S. at 487, 71 S.Ct. at 818, 95 L.Ed. at 1124. If, after careful consideration of all the circumstances, it is not *"perfectly clear ... that the witness was mistaken, and that the answer[s] cannot possibly* have [a] tendency to incriminate," the court must uphold the exercise of the privilege. *Id.* 341 U.S. at 488, 71 S.Ct. at 819, 95 L.Ed. at 1125 (emphasis in original) (citation omitted).

In *Zicarelli*, the New Jersey State Commission of Investigation had subpoenaed the witness to testify concerning organized crime, racketeering, and political corruption in Long Branch, New Jersey.[2] Notwithstanding a grant of use and derivative use immunity, the witness invoked his privilege against compelled self incrimination, and persisted in refusing to answer the Commission's questions. At a hearing on an order to show cause issued by the Superior Court of Mercer County, New Jersey, the witness challenged the order on the ground (among others) that his testimony would expose him to the danger of foreign prosecution. Therefore, the witness argued that the grant of immunity was inadequate to protect his Fifth Amendment right.

---

**2.** The New Jersey Legislature created the New Jersey Commission of Investigation primarily to investigate organized crime, racketeering, and political corruption in New Jersey. Like the OSI in this case, the Commission had investigatory, but no criminal prosecutory, powers.

In an effort to substantiate his fear, the witness pointed to a number of magazine and newspaper articles labelling him "the foremost internationalist in organized crime," and detailing alleged illegal activities in Canada and the Dominican Republic. The Court observed, however, that while these articles lent support to a claim of fear of foreign prosecution in the abstract, they did not substantiate his claim in the context of the Commission's questions. 406 U.S. at 479, 92 S.Ct. at 1675, 32 L.Ed.2d at 240 (*citing Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. at 1123). The Court concluded that these questions sought information relating to organized crime in New Jersey only. Thus, the witness was never in any *real* danger of being compelled to disclose information that might incriminate him under foreign law. More importantly, the Court observed that, to the extent a truthful answer to the Commission's questions might actually incriminate the witness under foreign law, he was free to qualify his responses by confining them to his domestic activities. 406 U.S. at 481, 92 S.Ct. at 1676, 32 L.Ed.2d at 241. "To have divulged international responsibilities would have been to volunteer information not sought, and apparently not relevant to the Commission's investigation." *Id.* Accordingly, the Court held that the witness's fear of incrimination under foreign law was remote and speculative, and therefore, insufficient to trigger the Fifth Amendment privilege.

■ Since the Supreme Court's decision in *Zicarelli,* the circuit courts have identified a number of factors that bear on whether the witness's fear of foreign incrimination is real or imaginary. These include: (1) the nature of the foreign charges, if any, that could be filed against him; (2) whether the witness is a target of an existing or potential foreign prosecution; (3) whether any of the charges would entitle the foreign jurisdiction to have the witness extradited; and (4) whether there is a likelihood that his testimony would be disclosed to a foreign government. *See, e.g., In re Application of President's Comm'n On Organized Crime,* 763 F.2d 1191, 1198 (11th Cir.1985); *In re Flanagan,* 691 F.2d 116, 121 (2d Cir.1982).

■ While the context in which the privilege is asserted will dictate the factors the court will consider in assessing whether there is a real hazard of incrimination [*see, e.g., Zicarelli, supra,* 406 U.S. at 479–81, 92 S.Ct. at 1675–76, 32 L.Ed.2d at 240–41], the burden is on the witness to prove that hazard, whether he alleges a fear of incrimination under foreign law or under domestic law.

In this case, Gecas claims to fear possible incrimination under the laws of Israel, Germany, Lithuania, and the former Soviet republic of Byelorussia, now known as Belarus. It is clear to me that, insofar as it relates to Israel, Germany, and Lithuania, this fear is real and substantial, and not merely speculative or imaginary. All three have enacted laws under which they could prosecute Gecas for war crimes. Israel's "Nazi and Nazi Collaborators" statute [Law 3710–1930] purports to apply extraterritorially and imposes the death penalty for persons who, during the period of the Nazi regime in an "enemy" country, committed acts constituting a crime against the Jewish people.[3]

Germany's murder statute, Article 211 [StGB 211], which apparently has no statute of limitations, provides:

> (6) destroying or desecrating Jewish religious or cultural assets or values;
> (7) inciting to hatred of Jews;
> By its terms, this statute applies extraterritorially. Two notable prosecutions have occurred under the authority of this statute. The first was Adolph Eichmann. The second, and most recent, was Ivan Demjanjuk. Both were convicted and sentenced to death in Israel, even though the acts for which they were being prosecuted occurred outside Israel. The Demjanjuk case is discussed in greater detail *infra,* and his conviction in Israel has now been reversed.

---

**3.** Israel's "Nazi and Nazi Collaborators" statute [Law 3710–1930] in pertinent part provides that a "crime against the Jewish people" means any of the following acts, committed with intent to destroy the Jewish people in whole or in part:
(1) killing Jews;
(2) causing serious bodily or mental harm to Jews;
(3) placing Jews in living conditions calculated to bring about their physical destruction;
(4) imposing measures intended to prevent births among Jews;
(5) forcibly transferring Jewish children to another national or religious group;

(1) A murderer shall be punished by imprisonment for life.

(2) A murderer is a person who kills another person from thirst for blood, satisfaction of his sexual desires, avarice or other base motives in a malicious or brutal manner or one dangerous to public safety or in order to permit the commission or concealment of another criminal act.

Although this statute does not specifically provide for extraterritorial application, Germany has used it to prosecute former German citizens alleged to have committed murder in German occupied countries during World War II. For instance, in 1983 Germany apparently relied on Article 211 to secure the extradition from Canada of Albert Helmut Rauca. D. Martin, "Canada Orders Extradition of Accused Nazi," *The New York Times*, November 5, 1982, at A3. Like Gecas, Rauca was suspected of committing war crimes in Lithuania. A former Nazi SS sergeant, Rauca was alleged to have ordered the murder of over 11,000 Jews at the Kaunas concentration camp in Lithuania between August 1941 and December 1943. *Id.* Rauca is reported to have died in prison in Germany approximately one month before his trial was to begin. *See* J. Burns, "Ottawa Will Act On Nazis In Canada," *The New York Times*, January 7, 1987, at A5.

Unlike Rauca, however, Gecas is not now, and never was a German citizen. There is some doubt whether German jurisdiction extends to prosecution of foreign nationals alleged to have committed war crimes on behalf of the Nazis in German occupied territories during WWII. However, in a letter to then Attorney General William French Smith, the German Minister of Justice indicated that such prosecutions would be possible in cases presenting exceptional circumstances. *See* Letter from Jurgen Schmude, Minister of Justice, Federal Republic of Germany, to William French Smith, United States Attorney General, (Feb. 12, 1982) (Tab 10 of defendant's appendix).

Finally, Gecas points to a recently enacted Lithuanian statute making genocide, as well as the murder, torture, execution and deportation of Lithuanian people during the period of Nazi occupation, a crime. The statute is retroactive and provides for life imprisonment. It specifically states that it is not subject to a statute of limitations.

The Petitioner has noted that the translations of the statutes submitted by Gecas are not certified. Gecas responds that he does not have access to certified translations, but the United States does. Nevertheless, the government has not challenged Gecas's translations by submitting its own. Given the minimal showing required of Gecas under *Hoffman*, I conclude that these translations are sufficiently accurate for my consideration.

As for his fear of incrimination under the laws of Belarus, Gecas submits copies of a number of laws of the former Soviet Union. There is no evidence that these laws are still in effect in any of the former republics, or in Belarus in particular. Gecas also refers to the practice, allegedly common in the former Soviet Union, of meting out summary punishment after a show trial. In view of its current status, the laws and practices of the former Soviet Union are of questionable relevance to these proceedings. Accordingly, I do not accept them as evidence of possible incrimination or prosecution in Belarus.

However, having determined that Israel, Germany, and Lithuania each could prosecute Gecas for acts committed in Lithuania during W.W.II, the question still remains whether such prosecution is likely in the "ordinary course of the law in the ordinary courts." First, I note that Israel and Germany are both parties to extradition treaties with the United States. In addition, The Supreme Council of the Republic of Lithuania recently has adopted a resolution

charging the Presidium of the Supreme Council of the Republic of Lithuania to create a commission for the investigation of crimes of genocide in Lithuania and to empower it to establish a documentation center, which would reach general conclusions about crimes of genocide performed during the periods of occupation as well as annexation by the USSR and Nazi Germany.

The resolution further obligates the government of Lithuania to enter into agreements

with the former Republics of the Soviet Union, the United States, Israel, and other countries for judicial assistance in cases involving the investigation of crimes of genocide. This resolution went into force on April 15, 1992.

As noted above, OSI's *raison d'etre* is to seek out and take legal action against Nazi collaborators who have surreptitiously made their way to the United States. As of July 1992, OSI is estimated to have investigated approximately 1,600 people. *See* T. Lewin, "For U.S. Nazi Hunters, A Mixed Year," *The New York Times,* July 6, 1992, at A9. It has reportedly filed 85 cases seeking denaturalization or deportation. *Id. See also, e.g., United States v. Edgars Inde,* Civil File No. 3–88–0570 (D.Minn. Aug. 22, 1989); *United States v. Mikelis Kirsteins,* No. 87–CV–964, 1989 WL 49796 (N.D.N.Y. May 10, 1989); *United States v. Wojchiechowski,* No. 85 C 6657 (N.D.Ill. May 28, 1986); *United States v. Trucis,* 89 F.R.D. 671 (E.D.Pa.1981); *United States v. Kowalchuk,* Civil Action No. 77–118 (E.D.Pa. Oct. 20, 1978); *In re Letters Rogatory From 9th Crim. Div., Regional Court, Mannheim, Federal Republic of Germany,* 448 F.Supp. 786 (S.D.Fla.1978).

Recently, the opening of archives in the capitals of the former Soviet republics has produced a well-spring of new evidence. The documents now available to OSI include rosters, pay stubs, medical and other records. This information has apparently enabled the OSI to add "several thousand" new names to the Immigration and Naturalization Service "watch list" of ex-Nazis. From the evidence in the record, it appears that these records may have led the OSI to Gecas.

The only sanctions available to OSI are denaturalization and deportation. Because the litigation process can be lengthy, it is OSI's acknowledged policy to encourage extradition. To promote extradition, OSI has endeavored over the years to forge relationships with a number of foreign governments whose domestic laws would permit prosecution of the Nazis OSI deports. For instance,

in 1983–84, the OSI actively encouraged Israel to seek the extradition of Cleveland, Ohio, auto worker Ivan Demjanjuk. OSI investigators had accused Demjanjuk of being "Ivan the Terrible", the notorious operator of the gas chamber at the Treblinka extermination camp in Poland. *See Demjanjuk v. Petrovsky,* 776 F.2d 571 (6th Cir.1985) (affirming denial of petition of habeas corpus). Ultimately, Demjanjuk was extradited to Israel where he was prosecuted under Israel's Nazi and Nazi Collaborators law for crimes that allegedly took place, not in Israel, but in Poland.

During the trial, Israeli prosecutors reportedly used evidence provided by OSI. *See* "U.S. Gives Nazi Data To Israelis," *The Washington Post,* May 16, 1984, at A10. After a lengthy trial, the Israeli trial court found that Demjanjuk was in fact "Ivan the Terrible". The court sentenced him to death, and Demjanjuk appealed. The Supreme Court of Israel stayed Demjanjuk's execution and has now reversed his conviction in light of new evidence. After allegations of OSI withholding exculpatory evidence came to light, then Attorney General William P. Barr ordered the Justice Department's Office of Professional Responsibility to conduct an investigation. Additionally, in a rare action, the Sixth Circuit, *sua sponte,* reopened the Demjanjuk case in order to determine if it was mislead into affirming the lower court's denial of Demjanjuk's petition.[4]

In this case, it is admitted that the OSI suspects Gecas of being a Nazi collaborator. However, petitioner counters that Gecas may choose the country to which he is deported. However, this argument overstates Gecas's options. A deportee may designate the country to which he or she is sent, "unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States." 8 U.S.C. § 1253(a). In addition, no deportee may designate more than one country. If that country refuses to accept, then the deportee automatically is sent to the

---

4. The recent report of Judge Wiseman of the U.S. District Court for the Middle District of Tennessee seems to confirm certain irregularities, and the Sixth Circuit has now allowed Demjanjuk to return to the United States, after a hearing held on August 4, 1993. *Demjanjuk v. Petrovsky,* 776 F.2d 571 (6th Cir.1985).

country of which the deportee is a national, and if that country refuses to accept the deportee, then his or her destination is within the sole discretion of the Attorney General. *Id.*

In this case, Gecas is a Lithuanian national. If he were compelled to testify, and his testimony revealed that he was a Nazi collaborator, it is unlikely that he would choose Lithuania as his destination. In making his designation, therefore, the question for Gecas becomes which country, if any, will accept a foreign national suspected of being a Nazi collaborator? It is not unreasonable for him to believe that the only country that would accept him is one that was capable of prosecuting him. Similarly, if the decision is left to the Attorney General, I can conclude only that, based on history, the Attorney General would probably choose a country capable of prosecuting Gecas.[5]

Finally, there is the possibility that Gecas may need to, or desire to, travel voluntarily to Israel, Germany, or Lithuania, or perhaps another country that may desire to prosecute him. The mere fact that, for whatever reason, Gecas is not deported or extradited does not make his fear of incrimination any less remote or speculative. *In re Tierney,* 465 F.2d 806, 812 (5th Cir.1972).

█ In sum, I conclude that Gecas's stated fear of foreign prosecution under the laws of Israel, Germany, and Lithuania are "substantial and real, and not merely trifling or imaginary." *Zicarelli v. New Jersey State Comm'n of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234, 240 (1972). Contrary to what the petitioner may believe, it is not *"perfectly clear"* to me that Gecas is mistaken in his fear, and that his answers to petitioner's questions *"cannot possibly* have [a] tendency to incriminate" him under the foreign laws discussed above. *Hoffman v. United States,* 341 U.S. at 488, 71

S.Ct. at 819, 95 L.Ed. at 1125 (1951). (emphasis in original) (citation omitted).

### B. *Sealing Order.*

I next examine whether an order sealing Gecas's deposition testimony is sufficient to supplant any privilege that might exist. In his opposition to the petition to enforce the administrative subpoena, Gecas peremptorily argues that such an order would be insufficient to supplant his Fifth Amendment privileges. Petitioner responds that a order sealing Gecas's deposition would make the disclosure and subsequent use of Gecas's testimony by a foreign sovereign so remote and speculative that the privilege against self incrimination would not be implicated. *See Zicarelli, supra,* 406 U.S. at 480–81, 92 S.Ct. at 1676, 32 L.Ed.2d at 241.[6]

In support of its argument, petitioner relies on a line of former Fifth Circuit and Eleventh Circuit cases dealing primarily with the secrecy of grand jury proceedings under Rule 6(e) of the Federal Rules of Criminal Procedure. The first is *In re Tierney,* 465 F.2d 806 (5th Cir.1972). In that case, a grand jury subpoenaed the witness and questioned him as to his knowledge of certain firearms transactions. After asserting his Fifth Amendment privilege to refuse to answer, the prosecutor extended use and derivative use immunity. The witness continued to refuse to testify on the grounds that his answers might incriminate him under the laws of Great Britain. Because the immunity granted him was insufficient to afford protection against such foreign prosecution, the witness argued that the Fifth Amendment entitled him to remain silent. The district court rejected this argument and held the witness in civil contempt.

On appeal, the former Fifth Circuit followed the *Zicarelli* analysis and looked first at whether there was a substantial risk of foreign prosecution. *Tierney,* 465 F.2d at

---

**5.** Petitioner points out that it knows of no country currently interested in prosecuting Gecas. This may be true, but a current indictment under foreign law is not the test. The test, as discussed above, is a realistic fear of prosecution, present or future. As with fear of domestic prosecution, the witness often invokes his Fifth Amendment rights to *prevent* indictment. Petitioner cannot

argue that such situations are not within the scope of the privilege.

**6.** Petitioner has not actually requested a sealing order. Rather, it argues that if the court, in its discretion, imposes such an order, it would be sufficient to answer Gecas's claims of self incrimination.

811. In its view, the secrecy of grand jury proceedings under Rule 6(e) of the Federal Rules of Criminal Procedure made the likelihood of disclosure of the witness's testimony to Great Britain so remote that there was no substantial risk of foreign prosecution. Therefore, the Fifth Amendment did not come into play.

Of course, this case does not involve grand jury material, and *Tierney*, therefore, is not directly applicable. However, reasoning by analogy to *Tierney* and Rule 6(e), the Eleventh Circuit later held, in *In re Application of President's Comm'n on Organized Crime (Scaduto)*, 763 F.2d 1191 (11th Cir.1985), that an order sealing a witness's deposition transcript in a non-criminal investigation is sufficient to eliminate the danger of disclosure to a foreign sovereign. 763 F.2d at 1199.

The witness in that case (Scaduto) had been subpoenaed by the President's Commission on Organized Crime to give testimony concerning narcotics trafficking between the United States and Italy. The witness already was serving a federal sentence for drug trafficking. Nevertheless, he filed a motion to quash the subpoena on the grounds, *inter alia*, that he feared prosecution by Italian authorities. At the time, there was a warrant pending in Italy for his arrest on drug trafficking charges, and he previously had been subject to questioning by Italian authorities.[7]

The District Court denied the witness's motion, and ordered him to testify *in camera* before a single Commission attorney. The District Court further ordered that the transcript of the witness's testimony be sealed, and that no one other than the parties have access to it. The court's order specifically prohibited disclosure, either direct or indirect, to any foreign sovereign, including the Italian government. The witness nevertheless continued to assert his Fifth Amendment privilege. The District court issued a compulsion order, and later held the witness in contempt when he continued to refuse to be deposed.

On appeal, the Eleventh Circuit determined that, irrespective of the effect of the district court's sealing order, the hazard of foreign prosecution was, at best, speculative. The witness already had been convicted in the United States on charges similar to those pending in Italy. Extradition, therefore, was not permitted under the applicable treaty, and a previous extradition request by the Italian government already had been rejected. If the witness's conviction was overturned on appeal, and the United States did not seek a retrial, extradition would be possible. However, the court found this sequence of events to be highly unlikely with reference to the ordinary operation of the law. Finally, the court concluded that, even if the witness was tried and convicted *in absentia*, such conviction would have no consequences for him if he is not subject to extradition. For these reasons, the court held that the asserted danger of foreign prosecution "appears to be of precisely that speculative variety that the Court found insufficient to support the assertion of a privilege in *Zicarelli*." *Id.*

Despite having fully resolved the witness's constitutional claim, the court went on to discuss the district court's sealing order. Referring to *Tierney*, it stated that, "the former Fifth Circuit has found Rule 6(e) fully adequate to prevent the likelihood of disclosure to a foreign sovereign.... By analogy, it would appear that the order given by the court is sufficient to eliminate the danger of such disclosure...." *Id.* Apparently in support of its analogy, the court went on to conject that "the officers of the court who would be involved in the taking of [the witness's] deposition would be less likely to "leak" information ... than members of the grand jury." *Scaduto, supra,* 763 F.2d at 1199.

These references to the district court's sealing order must be viewed as dicta. For several reasons, I do not believe that they should guide my decision in this case.

Insofar as the privilege against self incrimination is concerned, the secrecy attending grand jury proceedings and the se-

---

**7.** This questioning took place in the office of United States Attorney for the Eastern District of New York. At the interview, the witness stated that his appeal in the United States was pending, and exercised his right to remain silent.

crecy secured through the expedient of a sealing order in a civil case are not at all analogous. Pursuant to Rule 6(e), the secrecy of grand jury proceedings is grounded in the "ordinary operation of the law," and is necessarily a factor to be considered in assessing the likelihood of foreign incrimination. Therefore, it may be argued, as it was in *Tierney*, that in the ordinary course, the sequence of events necessary to breach the inherent secrecy of grand jury proceedings is so remote, and so unlikely to occur, that the Fifth Amendment need not take notice of the possibility.

In contrast, a sealing order in a civil proceeding is clearly a prophylactic measure which, when used in the manner suggested by the *Scaduto* opinion, is designed to supplant the witness's privilege. Taken to its logical conclusion, that rationale would seem to suggest that a court could compel testimony over a witness's assertion of his or her Fifth Amendment privilege in any civil proceeding, or even any criminal proceeding involving another defendant, simply by sealing the resulting transcript. This is clearly not the case. In an unbroken sequence of precedent stretching back over 100 years, the Supreme Court has held that, where a realistic danger of incrimination exists, the government may not compel the witness's testimony over a claim of Fifth Amendment privilege unless it supplants the privilege with protection of equivalent extent and scope. *Lefkowitz v. Turley*, 414 U.S. 70, 77–78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281–82 (1973); *Kastigar v. United States*, 406 U.S. 441, 449, 92 S.Ct. 1653, 1658–59, 32 L.Ed.2d 212, 219 (1972); *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 54, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678, 681 (1964); *Brown v. Walker*, 161 U.S. 591, 608, 16 S.Ct. 644, 651, 40 L.Ed. 819, 825 (1895); *Counselman v. Hitchcock*, 142 U.S. 547, 585, 12 S.Ct. 195, 206, 35 L.Ed. 1110, 1122 (1892). An order sealing deposition testimony simply does not provide this measure of protection, and therefore, is insufficient to supplant the privilege of a witness in a non-criminal investigation.

Furthermore, even if Rule 6(e) and a sealing order are analogous, neither *Tierney* nor *Scaduto* accurately assess the efficacy of externally imposed secrecy. While Rule 6(e) establishes a general rule of secrecy, the accumulation of exceptions has turned it into a veritable "Potemkin village" of what it purports to be. As amended in 1977, Rule 6(e) permits disclosure to an attorney for the government for use in the performance of his duty, as well as to government personnel deemed necessary to assist the government attorney in the performance of his "duty" to enforce the federal criminal law. As the Notes of the Advisory Committee indicate, the 1977 amendment was designed to *facilitate* the disclosure of grand jury testimony. Nor does the rule restrict the performance of such attorney's "duty" to the matter under investigation by the grand jury. Thus, disclosure may be made without order of the court to any government attorney whose need for the information stems from his "duty."

Although sworn to secrecy, jurors might consciously or inadvertently leak confidential information. In addition, government agents have been known to make unauthorized disclosures to third persons. Finally, the court has no way of controlling the number of stenographers, secretaries, law clerks, messengers and other sundry clerical personnel who necessarily come into contact with grand jury or otherwise sealed testimony.

Furthermore, and most importantly, the courts have much less control over disclosure of grand jury testimony to persons other than government attorneys and their agents than the *Tierney* analysis assumes. Disclosure of grand jury material containing exculpatory material is mandated by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Similarly, disclosure of a trial witness's grand jury testimony regarding matters testified to on direct examination at trial *must* be revealed pursuant to 18 U.S.C. § 3500(e)(3). Indeed, disclosure of grand jury records even has been authorized for use in private litigation. *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 220, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156, 165 (1979); *United States v. Proctor & Gamble*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958).

As discussed above, the Fifth Amendment's privilege against self incrimination rests on much firmer ground than the good faith of a sealed transcript. Experience teaches that the supposed "secrecy" of either grand jury material or sealed documents does *not* render the likelihood of incrimination remote or fanciful. For these reasons, I must conclude that an order sealing Gecas's deposition testimony in this case would be insufficient, both as a matter of law and as a matter of fact, to supplant his privilege against self-incrimination, if he has such a privilege.

### C. *Scope Of The Privilege Against Self Incrimination.*

Turning now to the constitutional question, Gecas argues that fear of foreign prosecution is within the boundaries of the privilege. The government, of course, argues that "fear of foreign prosecution is not a proper basis for asserting the Fifth Amendment privilege."

The case law bearing on whether the Fifth Amendment protects against fear of foreign prosecution provides no clear guidance. Of the lower federal courts that have considered the issue, only two courts of appeal have specifically held that the privilege does not apply to fear of foreign prosecution. The Tenth Circuit, in *In re Parker*, 411 F.2d 1067, 1070 (10th Cir.1969), *vacated as moot sub nom. Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970), simply stated that the Fifth Amendment provides no shelter against incrimination in a foreign jurisdiction. The court offered no analysis or citation to authority.

In *United States v. (Under Seal) (Araneta)*, 794 F.2d 920 (4th Cir.1986), the Fourth Circuit offered only a slightly more extensive analysis. In that case, the witnesses, who were the daughter and son-in-law of Ferdinand E. Marcos, former president of the Philippines, refused to testify before a grand jury investigating corruption in arms contracts with the Philippines on the grounds that their testimony would incriminate them under Philippine law.

Reasoning by analogy to the extension of the Fifth Amendment to prosecutions under state law, the court concluded that privilege applies only where the sovereign compelling the testimony and the sovereign using the testimony are both restrained by the Fifth Amendment. 794 F.2d at 926–27. Since the Fifth Amendment would not prohibit the use of compelled incriminating testimony in a Philippine court, it afforded no protection to an immunized witness fearing prosecution in the Philippines. *Id.* In the discussion that follows, I have attempted to analyze the privilege along this same vain, but in more detail.

Arrayed on the other side are numerous district court cases holding that the privilege does apply to fear of foreign prosecution. *See, e.g., United States v. Edgars Inde*, Case No. 3–88–0570 (D.Minn. Aug. 22, 1989) (OSI subpoena); *United States v. Mikelis Kirsteins*, Case No. 87–CV–964, 1989 WL 49796 (N.D.N.Y. May 10, 1989) (OSI subpoena); *United States v. Wojciechowski*, Case No. 85 C 6657 (N.D.Ill. May 28, 1986) (OSI subpoena); *In re Flanagan*, 533 F.Supp. 957, 965 (E.D.N.Y.), *rev'd on other grounds*, 691 F.2d 116 (2d Cir.1982) (grand jury subpoena); *United States v. Trucis*, 89 F.R.D. 671 (E.D.Pa.1981) (OSI subpoena); *United States v. Kowalchuk*, Case No. 77–118 (E.D.Pa. Oct. 20, 1978) (OSI subpoena); *In re Letters Rogatory From 9th Crim. Div., Regional Court, Mannheim, Federal Republic of Germany*, 448 F.Supp. 786 (S.D.Fla.1978); *In re Cardassi*, 351 F.Supp. 1080, 1084–85 (D.Conn. 1972) (grand jury subpoena). Indicative of the reasoning underlying these cases is the Eastern District of Pennsylvania's statement in *United States v. Trucis, supra,* that "the privilege is not simply a limit on the activities of American courts and law enforcement authorities: it is a freedom conferred upon persons within the protection of American law." 89 F.R.D. at 673.

These cases merely illustrate the underlying constitutional question: Is the Fifth Amendment privilege against self incrimination a personal "right" designed to secure the dignity of the individual against intrusion by government, or does it encompass a more limited restraint targeted at particular abuses of the government's power?

■ Some analysis of the rationale against self incrimination is in order. First, it must be acknowledged that the privilege does *not* embody a general policy against compulsion. The purpose of the privilege is not to protect a witness from prosecution. *Kastigar v. United States,* 406 U.S. 441, 449, 92 S.Ct. 1653, 1659, 32 L.Ed.2d 212, 219. Nothing in the history of the privilege brings into question the power of the government, in general, to compel witnesses to testify in court or before grand juries and other governmental agencies. *Kastigar v. United States,* 406 U.S. 441, 443, 92 S.Ct. 1653, 1655, 32 L.Ed.2d 212, 216; *Ullman v. United States,* 350 U.S. 422, 439 n. 15, 76 S.Ct. 497, 507 n. 15, 100 L.Ed. 511, 525 n. 15 (1956).

The privilege is not narrowly confined. For instance, it is long established that the privilege not only extends to answers that, in themselves, would support a conviction under a criminal statute, but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the witness for a crime. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1123 (1951); *Counselman v. Hitchcock,* 142 U.S. 547, 564–65, 12 S.Ct. 195, 198–99, 35 L.Ed. 1110, 1114–15 (1891). Moreover, a witness can assert the right "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory," where the answers might incriminate him in future criminal proceedings." *Kastigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212, 217 (1972). *See also Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281 (1973). Resident aliens also enjoy the privilege to the same degree as United States citizens. *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576, 583 (1953); *Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140, 143 (1896).

■ There are many situations that have always been treated as not falling within the scope of Fifth Amendment coverage. For example, where the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness, there is no privilege. *Brown v. Walker,* 161

U.S. 591, 597–600, 16 S.Ct. 644, 647–48, 40 L.Ed. 819, 821–23 (1896). Thus, the privilege does not apply to cases where the witness waives the privilege, or where prosecution is barred by a statute of limitations. *Id.* Likewise, if a witness already has received a pardon, he cannot utilize the privilege to avoid testifying. *Id.* And, if the answers have a tendency merely to disgrace or embarrass the witness, or bring him into disrepute, the witness may be compelled to answer. *Id.* In short, the privilege against self incrimination is not simply a witness protection device.

Second, as originally enacted, the Fifth Amendment's privilege functioned as a limit only on the federal government, and in no way regulated the relationship between the states and their respective citizens. *See, e.g., Jack v. Kansas,* 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234 (1905); *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896); *Barron v. Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). Only since 1964 has it been held to apply to the states. *Maloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

Third, a review of the Supreme Court of the United States' opinions construing the self incrimination provision identifies some common threads that shed light on how the issue in this case should be resolved.

In the very early case of *United States v. Saline Bank,* 26 U.S. (1 Pet.) 100, 7 L.Ed. 69 (1828), the United States, as creditor of the defendant unincorporated bank, filed a bill in equity against the cashier of the bank, as well as a number of its stockholders. In reply, the defendants stated that their answers to the bill would subject them to penalties under laws of Virginia prohibiting unincorporated banks. The Court's terse opinion, per Chief Justice Marshall, reads in its entirety:

This is a bill in equity for a discovery and relief. The defendants set up a plea in bar, alleging that the discovery would subject them to penalties under the statute of Virginia.

The court below decided in favour of the validity of the plea, and dismissed the bill.

It is apparent that in every step of the suit, the facts required to be discovered in support of this suit would expose the parties to danger. The rule clearly is, that a party is not bound to make any discovery which would expose him to penalties, and this case falls within it.

The decree of the Court below is therefore affirmed.

The precise basis of this holding remains unclear, because the opinion does not mention the Fifth Amendment. Instead, it refers merely to "the rule." It is quite possible, although not certain, that the Chief Justice was not referring to the Fifth Amendment, but to the age old "rule" of the Chancery Courts that "equity will not aid a forfeiture." That rule, though of common origin, developed separately from the privilege in the law courts.

In the first significant case to consider the application of federal statutory immunity, *Brown v. Walker*,[8] 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), the appellant argued, *inter alia*, that "while the witness is granted immunity from prosecution by the Federal government, he does not obtain such immunity against prosecution in the state courts." 161 U.S. at 606, 16 S.Ct. at 650, 40 L.Ed. at 824. While conceding that the Fifth Amendment's privilege did not apply to the states, the Court held that the statute suffered from no such limitation. It concluded that, by its plain terms, the statute protected against subsequent prosecution in both federal and state courts. This, of course, obviated the need to decide whether the fear of incrimination under state law triggered the privilege in federal proceedings.

· Shortly thereafter, the Court considered the relationship of state immunity to possible federal prosecution in *Jack v. Kansas*, 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234 (1905). In that case, the witness was called before a state grand jury, and after being granted immunity from subsequent state prosecution,

refused to answer certain questions relating to the violation of state antitrust laws on the ground that they would subject him to possible incrimination under federal antitrust law. The Supreme Court of Kansas affirmed his conviction for contempt. On writ of error to the Supreme Court of the United States, that Court reaffirmed its conclusion in *Brown* that the Fifth Amendment was not binding on the states. In the Court's view, the sole question, therefore, was whether the state's attempts to compel his testimony over his claim of privilege deprived him of his liberty without due process of law in violation of the Fourteenth Amendment (which was then applicable to the states).

The court observed that the state statute could not prevent a prosecution of the witness by the United States. Nor could it prevent the United States from using his testimony in the state proceeding against him in a subsequent federal prosecution. However, the Court observed that the questions posed to the witness only concerned activities within the state of Kansas, and did not involve interstate activities that might subject the witness to prosecution under the federal antitrust laws.

Assuming for the purposes of its analysis that the Fourteenth Amendment required that a state statute give "sufficient immunity from prosecution or punishment," the Court turned to the question of whether the witness had demonstrated a real and probable danger of federal prosecution. The Court agreed with the state court that "while there might be a bare possibility that a witness might be subjected to the criminal laws of some other sovereignty, it was not a real and probable danger, but was so improbable that it needed not to be taken into account." 199 U.S. at 381, 26 S.Ct. at 75, 50 L.Ed. at 237. It concluded, therefore, that there was no "real danger of a Federal prosecution, or that such evidence would be availed of by the Government for such purpose." 199 U.S. at 382, 26 S.Ct. at 76, 50 L.Ed. at 238.

---

**8.** The witness had been subpoenaed to appear before a federal grand jury to testify in relation to alleged violations of the Interstate Commerce Act. The immunity statute, which gave the witness absolute transactional immunity, provided that "no person shall be excused from attending and testifying" before the Interstate Commerce Commission [on Fifth Amendment grounds], but that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of" such testimony.

Five weeks later the Court decided *Ballman v. Fagin*, 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433 (1906). In *Ballman*, the witness had been held in contempt of a federal court for refusing to answer questions before a federal grand jury. He claimed that his answers might expose him to the criminal sanction under the law of the state in which the grand jury was sitting. The witness did not assert a fear of federal prosecution. Nevertheless, the Court at first ignored his stated claim of fear of incrimination under state law and, instead, discussed the possibility of incrimination under federal law. The Court concluded that such fear would be reasonable, if asserted. Justice Holmes, writing for the Court, stated that "Not impossibly [the witness] took this aspect of the matter for granted, as one which would be perceived by the court without disagreeably emphasizing his own fears." 200 U.S. at 195, 26 S.Ct. at 213, 50 L.Ed. at 437. Justice Holmes then addressed the real issue presented in the appeal:

> According to *United States v. Saline Bank*, [26 U.S.] 1 Peters, 100, he was exonerated from disclosures which would have exposed him to the penalties of the state law. *See Jack v. Kansas*, 199 U.S. 372 [26 S.Ct. 73], decided this term. One way or the other we are of opinion that Ballman could not be required to produce his cash book if he set up that it would tend to criminate him.

200 U.S. at 195–96, 26 S.Ct. at 213, 50 L.Ed. at 437. Thus, the Court seems to treat the question of potential state prosecution under federal immunity in the same manner as potential federal prosecution under state immunity—that it is dependent upon a factual showing of a "real and probable danger."

Two months later the Court decided *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). The witness in *Hale* had been held in contempt of a federal court for refusing to answer questions before a grand jury investigating violations of the Sherman Act. The witness was granted immunity pursuant to a federal statute that was identical in all relevant respects to the I.C.C. immunity statute at issue in *Brown v. Walker, supra*. Like the witness in *Brown*, the witness in *Hale* refused to answer on the grounds that the federal immunity statute did not protect him against subsequent state prosecution.

On the authority of *Brown*, the Court rejected the witness's contention, stating:

> [w]e need not restate the reasons given in *Brown v. Walker*, both in the opinion of the court, and in the dissenting opinion, wherein all the prior authorities were reviewed, and a conclusion reached by the majority of the court, which fully covers the case under consideration.

201 U.S. at 68, 26 S.Ct. at 376, 50 L.Ed. at 663. Ostensibly, this completely decided the case. Nevertheless, in curious fashion, the court went on to state:

> The question has been fully considered in England, and the conclusion reached by the courts of that country that the only danger to be considered is one arising within the same jurisdiction and under the same sovereignty. *Queen v. Boyes*, 1 B & S 311; *King of the Two Sicilies v. Willcox*, 7 State Trials (NS) 1049, 1068....
>
> The case of *United States v. Saline Bank*, 1 Pet. 100, is not in conflict with this.... It is sufficient to say that the prosecution was under a state law which imposed the penalty, and that the Federal court was simply administering the state law, and no question arose as to a prosecution under another jurisdiction.

201 U.S. at 69, 26 S.Ct. at 376–77, 50 L.Ed. at 663.

This "postscript" contains at least three enigmas. First, the court mysteriously fails to even mention its very recent decision in the remarkably similar case of *Ballman v. Fagin, supra*. Second, the court seems to inadequately distinguish the *Saline Bank* decision. That case clearly dealt with whether the United States, as plaintiff in a federal court, could force the defendant to give answers that might incriminate him under state law. It may have been applying state substantive law, but that seems irrelevant to the application of the Federal Constitution to the powers of the federal courts. Of course, *Saline Bank* is distinguishable on other grounds.

Finally, the Court fails to explain why an English case decided more than sixty years

after the adoption of the Bill of Rights to the Constitution of the United States has any bearing on the interpretation of the Fifth Amendment privilege. In any event, the *Hale* opinion also misconstrues the English rule as to the two cited cases. The case of *Queen v. Boyes* does not deal with the question whether the fear of foreign prosecution triggers the privilege. Rather, it seems only to set out the well known proposition that the privilege only protects against real and substantial dangers, not imaginary and speculative ones. It does not suggest that the danger of prosecution under foreign law could be ignored if it was real and substantial.

In *King of the Two Sicilies v. Willcox*, 1 Sim (NS) 301, 61 Eng.Rep. 116 (1851), the other English case upon which the Court relies, defendants resisted discovery of information which they asserted might subject them to prosecution under the laws of Sicily. In denying their claim, the Chancery Court stated:

> The rule relied on by the defendants, is one which exists merely by virtue of our own municipal law, and must, I think, have reference, exclusively, to matters penal by that law: To matters as to which, if disclosed, the judge would be able to say, as matter of law, whether it could or could not entail penal consequences.

*Id.* at 329, 61 Eng.Rep. at 128. This would seem simple enough, except that this specific holding is contrary to the later case of *United States v. McRea*, L.R. 3 Ch.App. 79 (1867). In that case, the United States sued in an English court for an accounting and payment of funds allegedly received by the defendant as agent for the Confederate States during the Civil War. The defendant refused to answer on the grounds that he thereby would incriminate himself under the laws of the United States. The United States relied on *King of the Two Sicilies*, *supra*. The court, however, limited *King of the Two Sicilies* to its specific facts and stated:

> But in giving judgment Lord Cranworth went beyond the particular case, and expressed his opinion that the rule upon which the Defendants relied to protect them from answering was one which exist-

ed merely by virtue of our own municipal law, and which must have reference exclusively to matters penal by that law. It was unnecessary to lay down so broad a proposition to support the judgment which he pronounced ... and I cannot feel that there is any judgment of his which ought to influence my decision upon the present occasion.

*Id.* at 85. The court then concluded that under the circumstances it could not "distinguish the case in principle from one where a witness is protected from answering any question which has a tendency to expose him to forfeiture for a breach of our own municipal law." *Id.* at 87.

Though *McRea* provides a contrasting view of the privilege, it is no more representative of the "settled" English rule of that than *King of the Two Sicilies*. Later commentators agree that the extent to which the privilege in England protected against the fear of foreign prosecution remained uncertain until 1968 when the British Law Reform Committee recommended to Parliament that the privilege be explicitly limited to domestic incrimination. In this regard, the Committee reported:

> There are no recent authorities as to whether a person may claim the privilege to refuse to answer questions or to produce documents which might incriminate him under foreign law and the two old authorities (*King of the Two Sicilies v. Willcox*, ... and *United States v. McRea*, ...) are not wholly consistent.... The problem presents difficulties since ... it may well be difficult for [an English judge] to [decide whether a witness's answer might incriminate him] where questions of the criminal law of foreign states are concerned. On the whole, we think that no absolute privilege should be given against self-incrimination under foreign law.

Law Reform Committee, Sixteenth Report, Cmd. 3472, No. 113, at 7 (1967). Parliament subsequently passed the Civil Evidence Act of 1968, adopting the Committee's recommendation. Civil Evidence Act, 1968, § 14. The same rule now also applies in criminal cases. 17 H. Halsbury, Halsbury's Laws of

England § 167, p. 240 & n. 7 (Hailsham 4th ed. 1976).

Meanwhile, the Supreme Court of the United States appeared to acknowledge the deficiencies of *Hale v. Henkel* in *Vajtauer v. Comm'r of Immigration*, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560 (1926). In that case, the appellant refused to answer questions in a deportation proceeding on the ground that they might incriminate him under the Illinois Syndicalism Law. Instead of relying on *Hale* and simply holding that the privilege did not extend to fear of prosecution under state law, the Court held that the witness had waived his privilege. In the words of the Court,

> [t]his conclusion makes it unnecessary for us to consider the extent to which the Fifth Amendment guarantees immunity from self-incrimination under state statutes or whether this case is to be controlled by *Hale v. Henkel*, 201 U.S. 43 [26 S.Ct. 370], *Brown v. Walker*, 161 U.S. 591, 608 [16 S.Ct. 644, 651]; *compare United States v. Saline Bank*, 1 Pet. 100; *Ballman v. Fagin*, 200 U.S. 186, 195 [26 S.Ct. 212, 213].

273 U.S. at 113, 47 S.Ct. at 306, 71 L.Ed. at 566.

Four years later, in *United States v. Murdock*, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), the Supreme Court finally confronted the issue it had reserved in *Vajtauer*. In *Murdock*, the appellant refused to answer the subpoena of a federal revenue officer on the ground that to do so would incriminate him under state law. Appellant conceded that his answers could not incriminate him under federal law, and since there was no immunity statute involved, the Court was forced to consider whether, in a federal proceeding, the Fifth Amendment guarantees immunity from self incrimination under state law.

The Supreme Court in *Murdock* disposed of the issue in one brief paragraph. Holding that the Fifth Amendment offered no protection, it reasoned that "[i]nvestigations for federal purposes may not be prevented by matters depending upon state law." 284 U.S. at 149, 52 S.Ct. at 64, 76 L.Ed. at 213. This is, of course, quite true, but it has

questionable relevance to the scope of the Fifth Amendment privilege. In any event, the Court already had established that the federal government could, under the Supremacy Clause, grant immunity from state prosecution. Accordingly, state law could not prevent a federal investigation. *See, e.g., Brown v. Walker, supra*, 161 U.S. 591, 597–600, 16 S.Ct. 644, 647–48, 40 L.Ed. 819, 821–23 (1896).

The *Murdock* Court then stated that "[t]he English rule of evidence against compulsory self-incrimination, on which historically that contained in the Fifth Amendment rests, does not protect witnesses against disclosing offenses in violation of the laws of another country. *King of the Two Sicilies v. Willcox*, 7 State Trials (N.S.) 1050, 1068; *Queen v. Boyes*, 1 B. & S. 311, 330." As discussed above, these cases do not actually support the court's conclusion, particularly in light of *United States v. McRea*, L.R. 3 Ch.App. 79 (1867).

Finally, the *Murdock* opinion continues:

> The principle established is that full and complete immunity against prosecution by the government compelling the witness to answer is equivalent to the protection furnished by the rule against compulsory self-incrimination. *Counselman v. Hitchcock*, 142 U.S. 547 [12 S.Ct. 195]. *Brown v. Walker*, 161 U.S. 591, 606 [16 S.Ct. 644, 650]; *Jack v. Kansas*, 199 U.S. 372, 381 [26 S.Ct. 73, 75]. *Hale v. Henkel*, 201 U.S. 43, 68 [26 S.Ct. 370, 376].

284 U.S. at 149, 52 S.Ct. at 55, 76 L.Ed. at 213. The cited cases do not, severally, support the stated "principle," but the Court apparently synthesizes a resolution from them.

Despite *Murdock*'s questionable reasoning, the question it addressed appeared to be settled. Over the next several years, the Court, relying on *Murdock*, decided a number of related issues. In *Feldman v. United States*, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944), the Court held that the use in a federal prosecution of testimony secured in a state proceeding under a grant of state immunity did not violate the accused's Fifth

Amendment privilege.[9] Similarly, the Court held that the Fifth Amendment privilege did not give a witness testifying in a state proceeding under a grant of state immunity a right to stand silent in the face of questions, the answers to which might incriminate him under federal law. *Knapp v. Schweitzer*, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958).

This apparent stasis was again disrupted in 1964, when the Supreme Court decided two landmark cases. The first was *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). In that case, the witness had plead guilty in Connecticut's state court to the misdemeanor of pool selling and was sentenced to a one-year jail term. The sentence was suspended after 90 days, and the witness was placed on two years probation. Shortly thereafter, the witness was ordered to testify before a state appointed referee conducting an inquiry into alleged gambling and other criminal activity. The witness refused to answer on the grounds that his answers would incriminate him under state law. The state court adjudged him in contempt and committed him to prison until he answered. On appeal of his petition for a writ of habeas corpus, the Connecticut Supreme Court of Errors held that the Fifth Amendment privilege was not available to the witness, that the Fourteenth Amendment extended no privilege to him, and that he had not properly invoked the privilege available under Connecticut's Constitution.

The Supreme Court of the United States granted certiorari and reversed. Overruling the longstanding precedent of *Twining v. New Jersey*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), the Court held that the Due Process clause of the Fourteenth Amendment incorporated the entire Fifth Amendment privilege against self incrimination and made it applicable against the states. *Malloy, supra*, 378 U.S. at 3, 84 S.Ct. at 1491, 12 L.Ed.2d at 656. Importantly, the Court also determined that the standard for invoking the privilege was the same under both the Fourteenth and Fifth Amendments. 378 U.S. at 11, 84 S.Ct. at 1495, 12 L.Ed.2d at 661.

The second case, which relates more directly to the present inquiry, and which was decided on the same day as *Malloy*, was *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). The witnesses in *Murphy* were subpoenaed to testify before the Waterfront Commission of New York Harbor concerning certain work stoppages. Notwithstanding a grant of immunity from prosecution in New York and New Jersey, the witnesses refused to respond to questions on the ground that the answers might tend to incriminate them under *federal* law, to which the grant of immunity did not extend. In light of its decision of the same day in *Malloy*, the Court framed the issue in *Murphy* as "whether one jurisdiction within or federal structure may compel a witness, whom it has immunized from prosecution under its laws, to give testimony which might then be used to convict him of crime against another such jurisdiction." 378 U.S. at 53, 84 S.Ct. at 1595–96, 12 L.Ed.2d at 680.

After briefly summarizing some of the well accepted policies behind that privilege, the Court traced a line of cases that included all of those discussed above. Relying primarily on *Ballman, Saline Bank*, and on the En-

---

9. The *Feldman* Court also rested its decision in part on an analogy to the search and seizure rule known as the "silver platter doctrine." Under this rule, evidence secured by unreasonable searches and seizures by state officials without the participation of federal agents was admissible in a federal prosecution. *See Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). After the Fourth Amendment became applicable to the States through the Due Process Clause of the Fourteenth Amendment, the Supreme Court overturned the "silver platter doctrine." *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

The *Feldman* court also relied on a misconception of the holding of *Brown v. Walker, supra*. The Court stated that *Brown* "rejected the argument that because federal immunity could not bar use in a state prosecution of testimony compelled in a federal court, the immunity falls short of the constitutional requirement." *Feldman*, 322 U.S. at 491, 64 S.Ct. at 1084, 88 L.Ed. at 1413. As discussed in the text earlier, *Brown* never reached the constitutional question, holding instead that the federal immunity statute in question did, in fact, protect the witness from subsequent state prosecutions based on his testimony in the federal proceeding.

glish case of *United States v. McRea*, the Court concluded:

> We hold that the constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law.

378 U.S. at 77–78, 84 S.Ct. at 1609, 12 L.Ed.2d at 694. Accordingly, the court continued:

> [W]e hold the constitutional rule to be that a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. We conclude, moreover, that in order to implement this constitutional rule and accommodate the interests of the State and Federal Governments in investigating and prosecuting crime, the Federal Government must be prohibited from making any such use of compelled testimony and its fruits. This exclusionary rule, while permitting the States to secure information necessary for effective law enforcement, leaves the witness and the Federal Government in substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity.

378 U.S. at 79, 84 S.Ct. at 1609–10, 12 L.Ed.2d at 695 (footnote omitted).

In reaching its decision, the Court specifically overruled *Feldman v. United States*, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408 (1944), and by implication, overruled *Knapp v. Schweitzer*, 357 U.S. 371, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958). Moreover, the Court completely rejected the reasoning of *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906) and *United States v. Murdock*, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931).

According to the *Murphy* court, the "real" English rule, as set out in *United States v. McRea*, unequivocally permitted a witness to invoke the privilege for fear of foreign prosecution. As discussed above, this interpretation of *McRea* is probably no more an accurate assessment of the actual state of English law than was the Court's previous reliance, in *Hale* and *Murdock*, on *King of the Two Sicilies v. Willcox*. As discussed above, the so-called "English Rule" was far from settled until well after *Murphy* was decided. Nevertheless, the Court declared that

> [i]n light of the history, policies and purposes of the privilege against self-incrimination, we now accept as correct the construction given the privilege by the English courts [footnote omitted] and by Chief Justice Marshall and Justice Holmes [in *United States v. Saline Bank, supra* and *Ballman v. Fagin, supra*]. We reject—as unsupported by history or policy—the *deviation* from that construction only recently adopted by this Court in *United States v. Murdock, supra*, and *Feldman v. United States, supra*.

378 U.S. at 77, 84 S.Ct. at 1608–09, 12 L.Ed.2d at 694 (emphasis added).

Despite its broad implications and overarching language, this declaration must be viewed in light of the Court's simultaneous holding in *Malloy* that the Fifth Amendment privilege against self incrimination is fully applicable to the states. Once the states are bound, the specific holding in *Murphy*—that the Fifth Amendment protects both state and federal witnesses against incrimination under both state and federal law—follows as a logical consequence. Thus, with the ambiguous exceptions of *Ballman* and *Saline Bank*, the Supreme Court has never sanctioned recourse to the privilege where the witness feared prosecution by a sovereign state that was not itself bound by the Fifth Amendment.

### 3. Scope of the Privilege

 From this analysis, I must conclude that the Fifth Amendment privilege against compelled self incrimination is not a personal "right" conferred upon persons within the protection of American law. *See United States v. Tucis*, 89 F.R.D. 671, 673 (E.D.Pa.1981). Instead, it is intended to regulate the actions of the government of the United States and its component states in two basic ways. First, it prevents inhumane treatment of individuals from whom informa-

tion is desired. *Cf. Murphy v. Waterfront Comm'n, supra*, 378 U.S. at 55, 84 S.Ct. at 1596–97, 12 L.Ed.2d at 681. It does this by removing the impetus for the use of oppressive interrogation tactics such as physical abuse, "third degree" methods, and browbeating.

Second, the privilege contributes to a "fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load." *Cf. Murphy v. Waterfront Comm'n, supra*, 378 U.S. at 55, 84 S.Ct. at 1597, 12 L.Ed.2d at 681. It thus eliminates the procedural abuses and "fishing expeditions" occasioned by the indiscriminate use of the oath *ex officio*. It is in order to secure these improvements in our system of justice that we deliberately permit the loss of what is often the best evidence in a criminal case, the defendant's own statements. The privilege is a limitation only upon the power of the United States and its component states. It cannot, and does not, affect foreign governments.

Extending the privilege against self incrimination to include fear of foreign prosecution would seriously erode domestic law enforcement. Almost any act, including the act of testifying itself, may be criminal under the laws of some sovereign, somewhere. Today, when communication and travel across international borders is as commonplace as travel across state borders, almost any witness could claim a realistic fear of incrimination under foreign law. A rule which recognizes incrimination under foreign law as a basis for privilege would have the effect of denying the forum sovereign the power to grant immunity as broad as its privilege. Thus, such a rule would deny it the power, by any means, to compel much testimony. In the many cases where the witness could

show a realistic fear of foreign incrimination, the enforcement of our domestic law would, necessarily, become dependent on matters of foreign law.[10]

This erosion of law enforcement would come without any countervailing benefit to or for the system of justice. Where the witness fears foreign prosecution, none of the purposes of the privilege applies. Any motive to inflict harm because of the incriminating nature of the disclosure is absent. Similarly, the sentiments relating to conflicts between the witness and the government do not apply where the two are not in conflict over potential criminal liability.[11] Thus, testimony that is incriminating under foreign law is of no more interest to the interrogator than any other information compelled of the witness.

To be sure, extending the privilege against compelled self incrimination to fear of foreign prosecution would provide witnesses with an extra measure of security. It could be argued that this is indeed a "benefit". But it is a benefit only to the individual. It does not make our system of law enforcement any more efficient or humane. In fact, it would have nothing to do with the enforcement of domestic criminal law. Such an extension is rational, therefore, only if the overriding purpose of the privilege is personal, a "right" in today's lexicography, and without any concomitant benefit to our system of law enforcement. As discussed above, this is simply not the purpose or *raison d'etre* of the privilege.

This is not to say that the privilege is blind to the dignity of the individual. It certainly has the effect of preserving the witness's individual privacy. But it does so only in the limited context of a criminal prosecution by our federal or state governments, and for the limited purpose of preventing overreaching in the enforcement of our own domestic criminal law. For this reason, the privilege does

10. It may be recalled that this is one of the reasons given in *United States v. Murdock*, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210 (1931), for refusing to extend the federal privilege to fear of state prosecution.

11. There can be no doubt that in this case Gecas and the government are in "conflict" over his

right to remain in this country. And while the supreme court has recognized that deportation is as drastic a punishment as any criminal sanction, it has not recognized the application of the Fifth Amendment privilege to these civil proceedings. Nor has Gecas raised this issue.

not protect against fear of foreign prosecution.

## III. CONCLUSION

In sum, I find that Gecas's fear of incrimination under the laws of several other countries is real and substantial, and not merely speculative or imaginary. Sealing his deposition testimony would neither supplant any privilege that might exist, nor render his fear of foreign incrimination so remote as to make it unnecessary to reach the ultimate constitutional question. However, after a lengthy analysis, it is clear to me that the Fifth Amendment privilege against compelled self incrimination does not protect a witness who fears incrimination or prosecution under the criminal laws of a foreign sovereign. Accordingly, petitioner's motion to enforce its administrative subpoena is GRANTED in all its particulars.

DONE AND ORDERED.