**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Vytautas GECAS, Defendant–Appellant.**

**No. 93–3291.**

United States Court of Appeals,
Eleventh Circuit.

April 13, 1995.

Ivars Berzins, Babylon, NY, for appellant.

E. Bryan Wilson, Asst. U.S. Atty., U.S. Dept. of Justice, Tallahassee, FL, Robert G. Seasonwein, U.S. Dept. of Justice, Office of Special Investigations, Washington, DC, for appellee.

Before BIRCH and DUBINA, Circuit Judges, and JOHNSON, Senior Circuit Judge.

BIRCH, Circuit Judge:

This case requires us to determine whether a witness may invoke the Fifth Amendment privilege against self-incrimination for fear of foreign prosecution. The district court held that the Fifth Amendment privilege was not a "personal 'right' conferred upon persons within the protection of American law," *United States v. Gecas*, 830 F.Supp. 1403, 1421 (N.D.Fla.1993), and thus could not "protect a witness who fears incrimination or prosecution under the criminal laws of a foreign sovereign," *id.* at 1423. The district court ordered the witness to testify, and he appealed. Because we conclude that the witness-appellant has a real and substantial fear of foreign prosecution and that the Fifth Amendment privilege is a personal right that may be asserted by this witness, we AFFIRM in part and REVERSE in part the district court's order and REMAND this case for proceedings in accordance with this opinion.

## I. BACKGROUND

In 1991, appellee Office of Special Investigations (OSI), an arm of the Criminal Division of the Department of Justice,[1] issued a subpoena to appellant Vytautas Gecas to appear before an OSI attorney to testify and to produce documents relating to Gecas's immigration to the United States and his activities in Europe, concentrating on the years 1940 to 1945, during World War II.[2] According to immigration documents, Gecas, a resident alien, was born in 1922 in Naumiestis, Taurage Province, Lithuania. In 1962, he immigrated to the United States from Great Britain. Gecas now resides in Florida. OSI believes that Gecas entered the United

---

1. OSI was formed by Attorney General Benjamin R. Civiletti in 1979 to investigate and institute legal (denaturalization and deportation) proceedings against suspected Nazi war criminals.

2. Pursuant to 8 U.S.C. § 1225, OSI ordered Gecas to bring to the deposition:
 All documents and photographs (whether originals or copies) in [his] possession or under [his] control which concern [his] date and place of birth, [his] whereabouts and activities in Europe (including but not limited to 1940–1945), [his] immigration to and residence in the United States.

 R1–2–Exh. C at 1. Gecas was also to provide testimony "relating to [his] residence and activities in Europe (including but not limited to the years 1940–1945)." *Id.*

States illegally, and it is investigating Gecas for the purpose of deportation. OSI specifically contends that Gecas lied in his immigration application about his activities during World War II and that he assisted Nazi forces occupying Lithuania in committing atrocities during the war and participated in the persecution of persons because of their race, religion, or political opinion.[3] If these allegations are true, then Gecas should not have been allowed to enter the United States.[4]

At the deposition, OSI attorneys placed Gecas under oath and asked him to identify documents and to answer questions regarding (1) his background, such as date of birth, residence in Europe during the war, and information on his immigration application; (2) his association with Lithuanian military units and political groups, his relationship to the certain political groups' publications and his familiarity with specific individuals in the military or the political groups during the war; and (3) his participation in and knowledge of the adverse treatment of Jews during the war. Gecas stated his name and his current and former addresses; he refused to answer all other questions by stating, "I decline to answer on the ground that the answer might tend to incriminate me." R1–2–Exh. D at 7, *passim.* Of the documents requested, Gecas produced only his alien registration card.

In early 1992, OSI petitioned the Northern District of Florida to enforce the administrative subpoena. After receiving information from both parties, the court held that, although Gecas had a "real and substantial fear of foreign prosecution," *Gecas,* 830

F.Supp. at 1406, the Fifth Amendment does not protect a witness from being compelled to give testimony that may incriminate him under the laws of a foreign country. The court ordered Gecas to comply with the subpoena; this appeal ensued.

## II. DISCUSSION

### A. *The Fifth Amendment Privilege Against Self–Incrimination*

The Fifth Amendment provides in part: "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V.[5] The right against self-incrimination extends to any compelled testimony which may be used directly against the witness in a subsequent criminal prosecution or any compelled testimony which may lead to discovery of any evidence later used against him in a criminal prosecution. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *see also Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653 (1964) ("Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured and may not by coercion prove a charge against an accused out of his own mouth."). "[The privilege] can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory...." *Kastigar v. United States,* 406 U.S. 441, 444–45, 453, 92 S.Ct. 1653, 1656, 1661, 32 L.Ed.2d 212 (1972) (holding that grant of immunity from use and derivative use is sufficient to supplant the privilege because no criminal prosecution could then be feared).

---

3. OSI believes that Gecas was "a member of the [2d/]12th Lithuanian Schutzmannschaft [Protective Detachment] Battalion, an armed auxiliary police unit that assisted the forces of Nazi Germany in the persecution of persons because of their race, religion, or national origin." Appellee's Brief at 6; *see also United States v. Ragauskas,* No. 94 C 2325, 1994 WL 445465 (N.D.Ill. Aug. 12, 1994).

4. *See generally* 8 U.S.C. §§ 1182(a)(3)(E), 1201(g), 1251(a)(4)(D) (providing for the exclusion and deportation of aliens who participated in Nazi persecution of persons because of race, religion, national origin or political opinion). *Cf. Fedorenko v. United States,* 449 U.S. 490, 509,

101 S.Ct. 737, 749, 66 L.Ed.2d 686 (1981) ("[A] misrepresentation [in a visa application] must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa.... [D]isclosure of the true facts about petitioner's service as an armed guard at Treblinka would, as a matter of law, have made him ineligible for a visa under the [Displaced Persons Act]....").

5. The Fifth Amendment right against self-incrimination is often referred to as a "privilege." *See Moses v. Allard,* 779 F.Supp. 857, 872 n. 20 (E.D.Mich.1991). We will use the terms "right" and "privilege" interchangeably.

The witness, however, may invoke the privilege only if he reasonably believes that the information sought could lead to criminal prosecution of him. *Id.*, 406 U.S. at 444–45, 92 S.Ct. at 1656. This belief cannot be speculative or the product of mere conjecture; it must be supported by reason or cause. *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968) ("The central standard for the privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination."); *Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818 (holding that the privilege applies only when a witness has "reasonable cause to apprehend danger from a direct answer"); *United States v. Cuthel,* 903 F.2d 1381, 1384 (11th Cir.1990) ("A witness may properly invoke the privilege when he 'reasonably apprehends a risk of self-incrimination, ... though no criminal charges are pending against him ... and even if the risk of prosecution is remote.'" (quoting *In re Corrugated Container Anti–Trust Litigation,* 620 F.2d 1086, 1091 (5th Cir.1980) (omissions in original))).

 Resident aliens may invoke the Fifth Amendment privilege against self-incrimination to the same extent that American citizens may invoke the privilege. *See Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 & n. 5, 73 S.Ct. 472, 477 & n. 5, 97 L.Ed. 576 (1953).[6] *But see United States v. Verdugo–Urquidez,* 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990) (limiting *Kwong Hai Chew* to holding that a "resident alien is a 'person' within the meaning of the Fifth

Amendment," and holding that Fourth Amendment prohibition against unlawful searches and seizures does not apply extra-territorially to aliens). The government and Gecas agree that he has no fear of domestic criminal prosecution on the basis of the testimony sought by OSI; rather, OSI is seeking to deport him, which is a domestic civil proceeding.[7] Yet, Gecas charges that forcing him to testify regarding his activities during World War II and his immigration to the United States could subject him to prosecution by the governments of Israel, Lithuania and Germany.[8] Thus, the issue is whether Gecas can avoid complying with the OSI subpoena by asserting his Fifth Amendment privilege against self-incrimination for testimony he claims may subject him to foreign prosecution.

### B. *Fear of Foreign Prosecution*

Neither the Supreme Court nor this court has decided the constitutional question of whether a witness may invoke his right against self-incrimination for fear of foreign prosecution. The Supreme Court has established that, before the constitutional question may be reached by any court, the witness must demonstrate (1) that the testimony would tend to incriminate him under foreign law and (2) that he has a "real and substantial fear" of foreign prosecution. *Zicarelli v. New Jersey State Comm'n of Investigation,* 406 U.S. 472, 478–80, 92 S.Ct. 1670, 1675–76, 32 L.Ed.2d 234 (1972); *In re Application of President's Comm'n on Crime,* (Scaduto) 763 F.2d 1191, 1198 (11th Cir.1985) [hereinafter

---

**6.** The Supreme Court in *Kwong Hai Chew* quoted with approval *Bridges v. Wixon,* 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945) (Murphy, J., concurring). In *Bridges,* the Court stated that resident aliens are "invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and Fifth Amendments and by the due process clause of the Fourteenth Amendment." *Id.*

**7.** Deportation proceedings are civil actions for which the penalty assessed is not criminal. *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1038–39, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984). *But see Verdugo–Urquidez,* 494 U.S. at 272–73, 110 S.Ct. at 1065 (declining to extend the *Lopez–Mendoza* holding to whether illegal aliens in the

United States may avail themselves of the protections of the Fourth Amendment). Therefore, the right against self-incrimination does not arise from the deportation proceeding's being a "criminal case" itself. In order to assert his privilege, the witness must fear institution of a criminal prosecution or a furtherance of an ongoing prosecution as a result of his testimony in the deportation proceeding or investigation.

**8.** Gecas originally contended that he also could be subject to prosecution in a former republic of the Soviet Union now known as Belarus. The district court found that fear to be inchoate. Gecas does not challenge that finding on appeal; therefore, we limit our discussion to the three countries upon which he does focus: Israel, Lithuania and Germany.

*Scaduto* ]. This is essentially the same test that a witness must pass if he asserts a fear of domestic criminal prosecution. *See Marchetti,* 390 U.S. at 53, 88 S.Ct. at 705; *see also In re Grand Jury Proceedings* (Samuelson), 763 F.2d 321, 323–24 (8th Cir.1985) (setting forth tests found in *Marchetti* and *Zicarelli* for fear of a state prosecution).

### 1. Incrimination under Foreign Law

■ Gecas charges that the testimony sought by OSI would incriminate him under

9. For example, OSI posed the following questions to Gecas:

 Q: Were you in Kaunas, Lithuania, at the time of the Nazi invasion?

 Q: When the Nazis invaded Lithuania, were you aware of the activities of ... partisan groups at that time?

 Q: What happened to Jews when the Germans invaded Kaunas?

R1–2–Exh. D–21.

 Q: Were Jews moved into ghettos and escorted by the Lithuanian Auxiliary Police?

 Q: Did you escort Jews into the ghettos?

*Id.* at 22.

 Q: Did you guard prisoners of war?

 Q: Did you guard labor camps?

 Q: Did you guard the ghetto?

 Q: Were you involved in any operations where pits or ditches were excavated?

 Q: *Were you involved in any executions?*

*Id.* at 28 (emphasis added).

 Q: A witness has testified that the first company of the 2d Battalion carried out an execution of Jews outside Minsk, is that true?

 Q: Were you at that execution site?

 Q: Did you know Jouzas Knyrimas?

 Q: Knyrimas has testified that he drove 1500 Jews from a Minsk ghetto to outside the city where pits had been dug. Were you there?

*Id.* at 29.

 Q: Were you in Slutsk when the 2d Battalion carried out its killing operations?

 Q: Wasn't it true that Lithuanians surrounded Slutsk and herded Jews into an execution site and then shot them?

 Q: While it was in Minsk, did the 2d Battalion participate in any public executions?

*Id.* at 31.

 Q: Where was the 2d Battalion stationed in 1942?

 Q: What duties did the 2d Battalion have in 1942?

 Q: While in Minsk, did the 2d Battalion participate in any actions against the Jewish population?

 Q: What happened to the Jewish population of Minsk on July 29, 1942?

 Q: Were you involved in that action?

*Id.* at 32.

 Q: When did you complete your service with the 2d Battalion?

the laws of Israel, Lithuania and Germany, because OSI is seeking to prove that Gecas was a Nazi collaborator.[9] In light of the testimony sought by OSI, we review the pertinent criminal provisions from each sovereign to determine whether, in general, Gecas's answers could tend to incriminate him under them.

Israel punishes Nazi war criminals under its Nazis and Nazi Collaborators (Punishment) Law, 3710–1930 (1950) (Isr.).[10] This

*Id.* at 33.

Gecas responded to each of these questions with the same response: "I decline to answer on the ground that the answer might tend to incriminate me." *Id.* at 7, *passim.*

10. The Nazis and Nazi Collaborators (Punishment) Law, 3710–1930, states in pertinent part:

 1. (a) A person who has committed one of the following offences—

 (1) done, during the period of the Nazi regime, in an enemy country, an act constituting a crime against the Jewish people;

 (2) done, during the period of the Nazi regime, in an enemy country, an act constituting a crime against humanity;

 (3) done, during the period of the Second World War, in an enemy country, an act constituting a war crime,

 is liable to the death penalty.

 (b) In this section—

 "crime against the Jewish people" means any of the following acts, committed with intent to destroy the Jewish people in whole or in part:

 (1) killing Jews;

 (2) causing serious bodily or mental harm to Jews;

 (3) placing Jews in living conditions calculated to bring about their physical destruction; ...

 (7) inciting to hatred of Jews;

 "crime against humanity" means any of the following acts:

 murder, extermination, enslavement, starvation or deportation and other inhumane acts committed against any civilian population, and persecution on national, racial, religious or political grounds;

 "war crime" means any of the following acts:

 murder, ill-treatment or deportation to forced labour or for any other purpose, of civilian population of or in occupied territory; murder or ill-treatment of prisoners of war or persons on the seas; killing of hostages; plunder of public or private property; wanton destruction of cities, towns or villages; and devastation not justified by military necessity.

law is applicable extraterritorially and punishes persons for crimes committed against Jews during World War II. Simply stated, the responses sought from Gecas by OSI could show that Gecas engaged in conduct punishable under this law. *See supra* note 9.

In 1992, Lithuania enacted a statute punishing Nazis and Nazi collaborators for actions taken against the Lithuanian people during World War II.[11] Punishments range from five years imprisonment to death. Law Concerning Responsibility for Genocide of the People of Lithuania, Num. 1–2477 (1992) (Lithuania), *as translated in* R2–19–Supp. Aff.App.–24. The law is retroactive and

places no statute of limitations for prosecution by Lithuania for these crimes. *Id.* at art. 3. Just as the testimony sought by OSI could tend to incriminate Gecas under Israeli law, clearly, it could also incriminate him under the Lithuanian genocide statute.

Germany, unlike Israel and Lithuania, does not criminalize genocide specifically. That country, however, has prosecuted persons suspected of crimes against Jewish people under its murder statute, Strafgesetzbuch [StGB] art. 211 (F.R.G.) [hereinafter "Article 211"],[12] for deaths that occurred during World War II.[13] There is, however,

---

**11.** The Lithuanian statute provides in pertinent part:

> The Supreme Council of the Republic of Lithuania,
>
> . . . . .
>
> declaring that a policy of genocide and crimes against humanity was carried out against the populace of Lithuania during the period of occupation by Nazi Germany and the period of occupation and annexation by the USSR,
>
> in accordance with the generally recognized rule of the international community, that the destruction of people for any reason is perceived to be a crime, passes this law.
>
> Article 1
>
> Actions which strive, completely or in part, to physically destroy people who belong to any particular national, ethnic, racial or religious group, and which manifest themselves through the murder of members of these groups, brutal torture, physical maiming, mental retardation; the deliberate creation of such living conditions through which it is strived to completely or in part destroy persons from these groups; the forcible transfer of children from these groups to others or the use of means which seek to forcibly limit the birth rate (genocide),—
>
> are punishable by incarceration for five to fifteen years along with the confiscation of belongings and property or by the death penalty along with the confiscation of belongings and property.
>
> Article 2
>
> The murder or torture of people in Lithuania, the deportation of her people, executed during the period of occupation by Nazi Germany or the period of occupation and annexation by the USSR, conform to the definition of crimes of genocide as indicated in the norms of international law.
>
> Article 3
>
> The law "Concerning Responsibility for Genocide of the People of Lithuania" is retroactive. A statute of limitations is not applicable

in those criminal cases where individuals committed the actions described in this law up until the date it comes into force.

Law Concerning Responsibility for Genocide of the People of Lithuania, Num. 1–2477 (1992) (Lithuania), *as translated in* R2–19–Supp. Aff.App.–24. Simultaneously, the Supreme Council of the Republic of Lithuania passed a resolution creating a commission to investigate crimes of genocide in Lithuania during World War II under occupation by Germany and the Soviet Union. Resolution In re the Application of the Law "Concerning Responsibility for Genocide of the People of Lithuania," Num. 1–2478 (1992) (Lithuania). In addition, the Supreme Council resolved to enter into agreements with the United States, Israel and other states "for judicial assistance in cases involving the investigation of crimes of genocide." *Id.*

**12.** Article 211 reads as follows:

> *Article 211 Murder*
> (1) A murderer shall be punished by imprisonment for life.
> (2) A murderer is a person who kills another person from thirst for blood, satisfaction of his sexual desires, avarice or other base motives in a malicious or brutal manner or one dangerous to public safety or in order to permit the commission or concealment of another criminal act.

Article 211, *reprinted in* Adalbert Ruckerl, The Investigation of Nazi Crimes 1945–1978, at 41–42 (Derek Rutter, trans., 1979). Ruckerl notes that "[b]ase motives are above all racial hatred." Ruckerl, *supra*, at 42.

**13.** The district court cited the case of Albert Helmut Rauca as an example of Germany's potential to prosecute suspected Nazis and Nazi collaborators. 830 F.Supp. at 1409. Rauca, a non-German citizen residing in Canada, was extradited to Germany. Once there, he was tried and convicted of murder. *Gecas*, 830 F.Supp. at 1409. Gecas also cites the case of Hermine Ryan, who was accused of being an S.S. Supervi-

some confusion regarding the applicability of Germany's statute to non-German citizens who committed the punishable acts outside the territorial jurisdiction of Germany. *See* Letter from William F. Smith, United States Attorney General, to Jurgen Schmude, Minister of Justice, Federal Republic of Germany 1–2 (Jan. 4, 1982), R2–14–App.–10; Letter from Jurgen Schmude, Minister of Justice, Federal Republic of Germany to William F. Smith, United States Attorney General (Feb. 12, 1982), R2–14–App.–10. If the statute does not cover crimes committed in Lithuania, then the testimony sought by OSI from Gecas would not be incriminating under German law.

Although the district court found that Gecas's testimony could incriminate him under German law, without deciding whether the district court erred, we disregard Germany's potential to prosecute Gecas because we find it superfluous. Regardless of Germany's potential to prosecute Gecas, if Gecas answered as OSI anticipated, that he participated in the execution of Lithuanian Jews during World War II, then his testimony would inevitably tend to incriminate him under the laws of Israel and Lithuania. Gecas thereby discharges the first impediment to reaching the constitutional question: his answers would tend to incriminate him under foreign law.

### 2. Real and Substantial Fear

 Whether Gecas had a real and substantial fear of foreign prosecution is a question of fact determined by the district court. *See e.g., Scaduto,* 763 F.2d at 1199. When faced with a question of fact, we defer to the district court's findings unless those determinations are clearly erroneous. Fed.R.Civ.P. 52(a). "This court will not disturb a district

court's findings of fact under the clearly erroneous standard unless it is left 'with the definite and firm conviction that a mistake has been made' after making all credibility choices in favor of the fact-finder's choice, *in light of the record as a whole.*" *Meek v. Metropolitan Dade County,* 985 F.2d 1471, 1481 (11th Cir.1993) (per curiam) (emphasis added) (quoting *Maddox v. Claytor,* 764 F.2d 1539, 1545 (11th Cir.1985)). "If the district court's finding is plausible in light of the entire record, 'the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" *Hiram Walker & Sons, Inc. v. Kirk Line,* 30 F.3d 1370, 1374 (11th Cir.1994) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Therefore, our review of the district court's findings of fact is limited to deciding whether clear error was committed.

The Supreme Court addressed this second prerequisite to reaching the constitutional question in *Zicarelli,* 406 U.S. at 478–81, 92 S.Ct. at 1675–76.[14] In *Zicarelli,* the Supreme Court found that, because the questions posed to the witness addressed only his activities within certain areas of New Jersey, and because the questions could be answered without divulging international responsibilities for alleged criminal activity, the witness "was never in real danger of being compelled to disclose information that might incriminate him under foreign law." *Id.* at 480, 92 S.Ct. at 1676. Therefore, the witness could not sustain his burden of showing a real and substantial fear of foreign prosecution.

We addressed this matter in *Scaduto,* 763 F.2d at 1198.[15] In that case, like *Zicarelli,* we found that the witness's fear was merely speculative. We set forth three factors

sory Warden at the Lublin Concentration Camp in Poland. *See In re Ryan,* 360 F.Supp. 270 (E.D.N.Y.), *aff'd,* 478 F.2d 1397 (2d Cir.1973). While the record does not reflect direct evidence of these prosecutions, the government does not contest the accuracy or legitimacy of these other prosecutions. *See* R2–21–11–12, Appellee's Brief at 21–22.

**14.** The Supreme Court declined to decide whether "a grant of [domestic] immunity [could] supplant the Fifth Amendment privilege with respect

to an individual who has a real and substantial fear of foreign prosecution," *Zicarelli,* 406 U.S. at 478, 92 S.Ct. at 1675, because the witness could not sustain his burden of proving such a fear.

**15.** Although we found that Scaduto's testimony would be "relevant to a foreign prosecution," we did not reach the constitutional question because the witness did not hold a real and substantial fear of foreign prosecution. *Scaduto,* 763 F.2d at 1198–99.

which the trial court must consider in deciding whether a real and substantial fear of foreign prosecution exists: (1) "whether there is a *likelihood* that his testimony would be disclosed to a foreign government," (2) "whether any of the [potential] charges would entitle the foreign jurisdiction to have him extradited," and (3) "whether there is an existing *or potential* foreign prosecution of the claimant." *Id.* (emphasis added). No single factor is conclusive, but rather cumulatively they provide a guideline for ascertaining the materiality of the witness's fear. We rejected Scaduto's assertion of fear of foreign prosecution because the State Department had already denied an extradition request for the witness once, thus eliminating any chance that he may be forced to enter the country which was prosecuting him, and because the district court had imposed an absolute ban on release of any of the information gathered, greatly reducing the likelihood of disclosure.[16] Applying the above factors in a general manner, the district court found that Gecas possessed a real and substantial fear of foreign prosecution based upon (1) OSI's purpose and operation; (2) the reality that Gecas would be deported to one of the countries that could prosecute him; and (3) the fact that Nazi war criminals had been prosecuted under the laws of Israel and Germany.[17] We review each of these seriatim.

### a. Likelihood of Disclosure

■ The purpose of OSI is to gather evidence of alleged Nazi collaborators residing in the United States illegally and to use that information to denaturalize and/or deport them. The Attorney General's order transferring Nazi "hunting" duties to OSI reflects this function:

It is the objective of this transfer to consolidate into a single unit within the Criminal Division all the Department's investigative and litigation activities involving individuals, who prior to and during World War II, under the supervision of or in association with the Nazi government of Germany, its allies, and other [affiliated] governments, are alleged to have ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin or political opinion.

This order assigns to the Criminal Division within the Department of Justice the primary responsibility for detecting, investigating, and, where appropriate, taking legal action to deport, denaturalize, *or prosecute* any individual who was admitted as an alien into or became a naturalized citizen of the United States and who had assisted the Nazis by persecuting any person because of race, religion, national origin, or political opinion.

Order of Atty. Gen. 851–79 (Sept. 4, 1979) (emphasis added). This order mandates that OSI shall:

1. Review pending and new allegations that individuals, who prior to and during World War II, under the supervision or in association with the Nazi government of Germany, its allies, and other affiliated governments, ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin or political opinion;

2. Investigate, as appropriate, each allegation to determine whether there is sufficient evidence to file a complaint to revoke citizenship, support a show cause order to deport, or seek an indictment or any other judicial process against any such individuals;

---

16. While it is possible that Scaduto's conviction will be reversed, *and* retrial will not be sought, *and* the Italian authorities will seek extradition, *and* U.S. authorities will comply, such a danger appears to be of precisely that speculative variety that the Court found insufficient to support the assertion of a privilege in *Zicarelli*. *Id.* at 1199.

17. Gecas's case is distinguishable from *Zicarelli* because none of Gecas's potential answers would incriminate him under American criminal law but could incriminate him under the laws of Israel and Lithuania. The Supreme Court allowed Zicarelli to testify only to domestic matters, which would be unfruitful here. We also distinguish *Scaduto* because, should OSI succeed in deporting Gecas, it is highly probable that he would be sent to Lithuania or Israel. *See infra* Part II(A)(2)(b). Scaduto did not face extradition or deportation to Italy where he was being subjected to criminal prosecution.

3. *Maintain liaison with foreign prosecution, investigation and intelligence offices;*

4. Use appropriate Government agency resources and personnel for investigations, guidance, information, and analysis; and

5. *Direct and coordinate the investigation, prosecution, and any other legal actions instituted in these cases with the Immigration and Naturalization Service, the Federal Bureau of Investigation, the United States Attorneys Offices, and other relevant Federal agencies.*

*Id.* at 2–3 (emphasis added). OSI's sole and exclusive jurisdiction is the collection of information and the institution of legal proceedings against suspected Nazi war criminals; OSI does not participate in the investigation of any other persons suspected of entering the United States illegally, only suspected Nazis.

OSI has shared with Israel incriminating evidence that it has gathered on another suspected Nazi collaborator, *U.S. Gives Nazi Data to Israelis,* Wash.Post, May 16, 1984, at A10; *see Gecas,* 830 F.Supp. at 1410; *Demjanjuk v. Petrovsky,* 10 F.3d 338, 370 (6th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 295, 130 L.Ed.2d 205 (1994), and has entered an agreement to provide such information to Lithuania, *see* Memorandum of Understanding Between the United States Department of Justice and the Office of the Procurator General of the Republic of Lithuania Concerning Cooperation in the Pursuit of War Criminals, Aug. 3, 1992, U.S.–Lithuania [hereinafter "Memorandum of Understanding"]. This Memorandum of Understanding states that the Department of Justice will:

cooperate *[with the Republic of Lithuania]* in *prosecution of persons who are alleged to have committed war crimes* as such people should not be allowed to evade responsibility and must be brought to justice. The prosecutions of such people are conducted *in accordance with the existing laws of the United States* and the Republic of Lithuania....

. . . .

... [T]he United States Department of Justice *agree[s] to provide ... legal assistance concerning the prosecution of persons suspected of having committed war crimes in World War II in Lithuania and who are now residents of the United States*—to facilitate the interview of witnesses, the conduct of other necessary activities, the collection of documentary materials and other information relevant to these investigations.

. . . .

... [T]he United States Department of Justice will assist ... in the location of witnesses believed to possess relevant information about criminal actions against the civilian population in Lithuania during World War II, and agree[s] to intermediate and endeavor to make these witnesses available *for the purpose of giving testimony in accordance with the laws of the Republic of Lithuania to authorized representatives of the United States Department of Justice.*

Memorandum of Understanding (emphasis added). The Memorandum of Understanding in effect mandates disclosure to Lithuania of the testimony sought from Gecas, increasing to a virtual certainty the likelihood that any information obtained from Gecas would be disseminated not only to Lithuania but also to the other possible prosecuting countries.[18] *Cf. United States v. (Under Seal)* (Araneta), 794 F.2d 920 (4th Cir.) (premising holding that Fifth Amendment did not allow Philippine citizens to refuse to testify before a grand jury after a grant of immunity from prosecution in the United States on the court's determination that the United States was not assisting any foreign government in prosecuting the Philippine citizens[19]), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986) [hereinafter *Araneta*]; *In re Letters Rogatory from the 9th Crim.Div., Fed. Republic of Germany,* 448 F.Supp. 786, 787 (S.D.Fla.1978) (holding that the Fifth Amendment right against self-incrimination allowed an American citizen to

---

**18.** This agreement may cede a measure of control over the prosecution of Nazi collaborators to OSI. *See infra* note 26 and accompanying text.

**19.** *See infra* Part II(A)(3)(b).

refuse to testify pursuant to a request from a foreign government where the witness reasonably fears prosecution by that government).

The district court correctly rebuffed OSI's attempt to assert that a sealing order would ensure that the information gained from Gecas's testimony would not be disclosed to Israel or Lithuania.[20] *Cf. Araneta,* 794 F.2d at 924–25 (rejecting ability of district court's order encompassing Fed.R.Crim.P. 6(e) procedures to protect witness from disclosure of grand jury testimony to foreign government because of foreign relations and importance of the case); *In re Cardassi,* 351 F.Supp. 1080, 1082 (D.Conn.1972) (rejecting Fed. R.Crim.P. 6(e)'s ability to protect witness from disclosure of grand jury testimony to foreign government). *But cf. United States v. Joudis,* 800 F.2d 159, 163 (7th Cir.1986) (declining to find sealing order ineffective because the witness had failed to present any evidence that the district court could not effectively limit access to the deposition or that "one of the parties, namely the OSI, is under some form of pressure to ignore the court's order and share the information . . ."); *Scaduto,* 763 F.2d at 1199 ("[I]t would appear that the order given by the court is sufficient to eliminate the danger of such disclosure. . . ."); *In re Tierney,* 465 F.2d 806, 811 (5th Cir.1972) ("[B]ecause of the secrecy of the grand jury proceedings no substantial risk of foreign prosecution was posed.").

The district court appropriately determined that a sealing order in this case would not eliminate Gecas's real and substantial fear of foreign prosecution. We distinguish *Joudis* because the Seventh Circuit based its finding that the sealing order would be effective on the underlying premise that there was no pressure on OSI to disclose the testimony. That finding is contrary to the instant situation; OSI's mission includes maintaining liaisons with foreign governments to arrange prosecution, and the Memorandum of Understanding with Lithuania obligates the government to disclose to Lithuania evidence obtained. In this case, there is significant pressure to disclose the testimony.

The previous cases in our circuit are distinguished similarly. *In re Tierney* fails to control here because here there is no federal criminal procedure rule like Rule 6(e) to protect Gecas from disclosure of his testimony. Although in *Scaduto,* we analogized a sealing order to Rule 6(e)'s protections and concluded that "the officers of the court who would be involved in the taking of Scaduto's deposition would be less likely to "leak" information in the manner feared by the *Flanagan* court than members of a grand jury," *Scaduto* 763 F.2d at 1199, this analogy was dicta as we had already found that the witness failed to assert a real and substantial fear of foreign criminal prosecution on all other grounds. In addition, a very different scenario was presented. The officers of the court in *Scaduto* were not attempting to deport Scaduto, as OSI is attempting to with Gecas, nor were they charged with maintaining liaisons with foreign governments for prosecuting and coordinating investigations for deportations and prosecutions in foreign nations as OSI is charged.

Although "[w]e do not suggest that a government official would knowingly violate the order of the district court, . . . we will not blind ourselves to the tensions . . . which may give rise to an inadvertent disclosure." *Araneta,* 794 F.2d at 925. "[I]f a disclosure is made, [consciously or inadvertently,] the courts of the United States are powerless to restore secrecy once it is lost." *Id.* Punishing the person who revealed the testimony in violation of a sealing order would be of no solace to Gecas, who as a result of the disclosure already may be subject to prosecution in a foreign state. *See id.* Moreover, because of the district court's familiarity with the parties and its understanding of the circumstances of this particular case, we defer to the district court's judgment that a sealing order would be ineffective. *See Gecas,* 830 F.Supp. at 1413–14. The district court did not err in finding it likely that any testimony

---

**20.** OSI did not request the district court to place a sealing order on the deposition and transcripts. It did, however, state that it "would not oppose a sealing order if deemed advisable by the court." R2–21–15.

provided by Gecas would be disclosed by OSI to countries which could potentially prosecute him.

### b. Extradition and Deportation

■ If Gecas is found to be deportable because he assisted the Nazis in their persecution of Lithuanian Jews and failed to disclose this information upon attempted entry into the United States, then the Attorney General of the United States has no discretion to prevent Gecas's deportation. *See* 8 U.S.C. §§ 1251(a)(4)(D), 1253(h) (naming participants in the Nazi persecution of persons during World War II as deportable aliens and removing attorney general's discretion from withholding deportation); *Kairys v. I.N.S.*, 981 F.2d 937, 938 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1832, 123 L.Ed.2d 460 (1993); *Kulle v. I.N.S.*, 825 F.2d 1188, 1191 (7th Cir.1987); *Linnas v. I.N.S.*, 790 F.2d 1024, 1029 & n. 1 (2d Cir.) ("The deportation of Nazi persecutors is required even though the deportee's life or freedom might be threatened as a result."), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986); *cf. Palciauskas v. I.N.S.*, 939 F.2d 963, 967 n. 9 (11th Cir.1991) ("A finding that petitioner is deportable as one who participated in persecution under 8 U.S.C. § 1251(a)(19) [predecessor to § 1251(a)(4)(D) ] would render him ineligible for certain forms of discretionary relief. . . ."). The district court likened deportation of Gecas in this case to *de facto* extradition,[21] because Gecas would be forced to enter a country disposed to prosecute him. Gecas may, as a matter of right, name one country to which he would like to be sent. This, however, is subject to the Attorney General's discretionary conclusion "that deportation to such country would be prejudicial to the interests of the United States." 8 U.S.C. § 1253(a); *cf. Linnas,* 790 F.2d at 1027–28 (reviewing the deportation procedures for country designation). If the Attorney General exercises that discretion or that country refuses to accept Gecas, which is plausible given that he is a suspected Nazi, he will be sent to the country of which he is a citizen, presumably Lithuania. *Cf. Linnas,* 790 F.2d at 1027 (acknowledging that deportee could not be sent to the country of which he was a citizen because it was no longer an independent state). If Lithuania did not accept him, which is doubtful given its opportunity to prosecute him, then he would be deported to his country of birth, previous residency or, at last resort, whatever country willing to accept him, including Israel.

---

21. *Cf.* Michael J. Bowe, Note, *Deportation as De Facto Extradition: The Matter of Joseph Doherty,* 11 N.Y.L.Sch.J.Int'l & Comp.L. 263, 269 (1990). The note distinguishes between extradition and deportation:

> International extradition returns an individual present in the United States to a country where the individual is wanted for criminal acts committed in that country or against its citizens. Deportation, on the other hand, removes an alien from the United States because the alien is undesirable or detrimental to the public welfare.

*Id.* (footnotes omitted). The argument is made that use of deportation is improper unless the person threatens the internal welfare of the United States. *Id.* at 269, 272.

> [E]xtradition, not deportation, is the mechanism designated by Congress to return criminals to foreign countries. Also, extradition, because of its criminal nature, contains procedural and substantive safeguards that protect individual liberty. Deportation, on the other hand, is not designed to return criminals to foreign countries but to protect the internal welfare of the United States. Therefore, its utilization to return an alleged criminal to a foreign country circumvents the safeguards contained in extradition.

*Id.* at 269; *see also* Theresa M. Beiner, Comment, *Due Process for All? Due Process, the Eighth Amendment and Nazi War Criminals,* 80 J.Crim.L. & Criminology 293, 315–26 (1989) (discussing deportation of an accused Nazi war criminal Karl Linnas as *de facto* extradition). *But see Linnas,* 790 F.2d at 1031 (2d Cir.) ("The fact that such an opportunity [to designate a country to which to be sent] was offered . . . strongly undercuts his contention that his deportation was a disguised attempt to extradite him. . . ."). Any challenge by Gecas that deportation proceedings may be inappropriate is not presented in this appeal. Nevertheless, we are convinced that the high probability Gecas will be sent to a country that will prosecute him tends to support Gecas's assertion of a real and substantial fear of foreign prosecution. We note that the right against self-incrimination in an extradition hearing has been denied by one district court without persuasive authority for or against extension of the privilege. *Esposito v. Adams,* 700 F.Supp. 1470, 1478 (N.D.Ill.1988) (denying petition for writ of habeas corpus to prevent extradition).

Because Gecas apparently is still a citizen of Lithuania, it is not only possible but also probable that Gecas will be deported to Lithuania. *Cf. id.* at 1027–28, 1031. Therefore, the district court did not clearly err in finding that there is a substantial likelihood that, if deported, then Gecas will be sent forcibly to a country with the ability and desire to prosecute him. *Cf. United States v. Trucis,* 89 F.R.D. 671, 673 (E.D.Pa.1981) ("In this case, the Government has been unable to provide any assurances that, in the event he loses his citizenship, [Trucis] would not be sent to a nation interested in his prosecution. And so the Government takes the broad ground that it is entitled to an order from this court compelling potentially incriminating answers from [Trucis], notwithstanding that it may thereafter deliver [Trucis] to a foreign government which may use those answers to fuel a criminal prosecution." (footnote omitted)).

### c. Prosecution of Nazi collaborators

■ We now must determine whether the countries of concern to Gecas have prosecuted or are prosecuting persons for participation in Nazi persecution during World War II. As we have discussed, Israel has a law designed specifically to punish Nazi collaborators for their acts outside Israel. Indeed, this law has been used to extradite and prosecute alleged Nazi collaborators. We need only consider the most prominent and noteworthy of the prosecutions, Ivan Demjanjuk, to highlight that there is a potential for Gecas to be prosecuted by Israel. *See generally Demjanjuk,* 10 F.3d at 340 ("The extradition order was based solely upon the district court's finding that Demjanjuk was Ivan the Terrible. This was the charge on which Israel sought his extradition, and on which he was ultimately tried and convicted by an Israeli trial court." (footnote omitted)). The record does not contain evidence that Lithuania has prosecuted anyone under the new genocide statute; however, the potential and apparent inclination to do so is present. *See* Law Concerning Responsibility for Genocide of the People of Lithuania, Num. 1–2477 (1992) (Lithuania), *as translated in* R2–19–Supp.Aff.App.–24; Memorandum of Understanding Between the United States Department of Justice and the Office of the Procurator General of the Republic of Lithuania Concerning Cooperation in the Pursuit of War Criminals, Aug. 3, 1992, U.S.–Lithuania.

We are mindful that we are not assessing the exact probability of prosecution, but only whether Gecas *potentially* could be prosecuted. *See United States v. Cuthel,* 903 F.2d 1381, 1384 (11th Cir.1990) ("A witness may properly invoke the privilege when he 'reasonably apprehends a risk of self-incrimination, ... though no criminal charges are pending against him ... and even if the risk of prosecution is remote.'" (quoting *In re Corrugated Container Anti–Trust Litigation,* 620 F.2d 1086, 1091 (5th Cir.1980) (alterations in original))); *see also In re Grand Jury Proceedings* (Samuelson), 763 F.2d 321, 324 (8th Cir.1985) ("[T]he *possibility* of prosecution alone removes the risk of such from the realm of the imaginary and speculative."). We also note that we are not concerned with the ultimate determination of guilt or innocence in such a prosecution. Under *Zicarelli* and *Scaduto,* we are interested in "real and substantial fear" of criminal proceedings being initiated.

Additionally, OSI's actions in this matter reveal its apparent belief that Gecas played more than a small role in committing atrocities against the Lithuanian Jewish population during World War II. OSI has offered and subsequently withdrawn an offer of immunity from deportation to Antanas Ragauskas in an attempt to have Ragauskas testify about Gecas's whereabouts and activities during World War II. *See United States v. Ragauskas,* No. 94 C 2325, 1995 WL 86640 at *3 (N.D.Ill. Feb. 27, 1995) (rejecting contempt request and allowing Ragauskas to assert his Fifth Amendment privilege against self-incrimination for fear of prosecution in Lithuania for questions relating to Ragauskas's activities during the war) [hereinafter *Ragauskas III* ]; *United States v. Ragauskas,* No. 94 C 2325, 1994 WL 445465 (N.D.Ill. Aug. 12,

1994) (enforcing new subpoena restricted to information on Gecas alone) [hereinafter *Ragauskas II* ]; *United States v. Ragauskas,* No. 94 C 2325, 1994 WL 270294 (N.D.Ill. June 14, 1994) (denying enforcement of an overbroad subpoena of Ragauskas for information on Gecas) [hereinafter *Ragauskas I* ]. Offering another suspected Nazi collaborator immunity from deportation in exchange for testimony regarding Gecas's participation in the same activities indicates that they believe Gecas to be a better candidate for deportation than Ragauskas.

OSI apparently is targeting Gecas and is willing to allow some suspected Nazis to remain in the United States so long as certain others are deported. *See also Joudis,* 800 F.2d at 161 ("The government offered to refrain from taking any action to deport [Mikutaitis] if Mikutaitis agreed to testify [against Joudis] and renounce his United States citizenship."). OSI's willingness to forego deportation of one suspected Nazi collaborator in order to collar another indicates that OSI is employing a hierarchial process of selection and that it does not consider all suspected Nazi collaborators deserving of deportation or *de facto* extradition. Consequently, OSI's singling out of Gecas and its efforts to obtain evidence against him elsewhere support Gecas's assertion of a real and substantial fear of foreign prosecution.

We refuse to turn a blind eye toward the underlying purposes and motivations of OSI and to ignore the reality of what may be accomplished if Gecas is forced to testify against himself. Under the *Scaduto* factors, we conclude that the district court did not err in finding that Gecas legitimately possesses a "real and substantial fear" of prosecution from Lithuania or Israel. Thus, we consider whether he may assert his Fifth Amendment privilege to avoid testifying.

3. Application of the Fifth Amendment

We review *de novo* the district court's legal determination that the Fifth Amendment right against self-incrimination does not protect witnesses from testifying to information which may later subject them to foreign prosecution. *Cf. McBride v. Sharpe,* 25 F.3d 962, 963 (11th Cir.) (en banc) ("Ques-

tions of law are subject to de novo review."), *cert. denied,* —— U.S. ——, 115 S.Ct. 489, 130 L.Ed.2d 401 (1994). To ascertain whether the right against self-incrimination should apply, it is important to understand the policies behind the right. Principally, the Fifth Amendment privilege supports two goals: constraining the government from overzealous prosecution of individuals and securing individual liberties. *See Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596–97, 12 L.Ed.2d 678 (1964); *Moses v. Allard,* 779 F.Supp. 857 (E.D.Mich.1991); Bret A. Fausett, Comment, "Extending the Self–Incrimination Clause to Persons in Fear of Foreign Prosecution," 20 Vand.J.Transnat'l L. 699, 707 (1987).

In *Murphy,* Justice Goldberg identified this first rationale as "our preference for an accusatorial rather than an inquisitorial system of criminal justice; [and] our fear that self-incriminating statements will be elicited by inhumane treatment and abuses." *Murphy,* 378 U.S. at 55, 84 S.Ct. at 1596–97. With respect to the second rationale, he wrote:

> [The privilege] reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; ... our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load" ... [and] *our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"* ....

*Id.* at 55, 84 S.Ct. at 1596–97 (citations omitted) (emphasis added). One district court noted that

> [T]he privilege against self-incrimination goes to the very heart of the ideas and beliefs underlying the establishment of this country. At its core, the privilege states that the individual is the master of the government and, thus, the government

may not use its power to dominate the individual.

*Moses,* 779 F.Supp. at 874. And another has held that "the privilege is not simply a limit on the activities of American courts and law-enforcement authorities: *it is a freedom conferred upon persons within the protection of American law.*" *United States v. Trucis,* 89 F.R.D. 671, 673 (E.D.Pa.1981) (emphasis added) (relying on *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972) and *United States v. Kowalchuk,* No. 77–118 (E.D.Pa. Oct. 20, 1978)). These policies are not mutually exclusive as both are served when the privilege is invoked properly.

### a. Domestic Law Enforcement

Our sister circuits that have addressed this issue, the Fourth Circuit and the Tenth Circuit [22], denied extension of the Fifth Amendment to protect witnesses in the United States where the witnesses feared only foreign prosecution.[23] *See United States v. (Under Seal)* (Araneta), 794 F.2d 920, 926–28 (4th Cir.1986) (concluding that "the Fifth Amendment privilege applies only where the sovereign compelling the testimony and the sovereign using the testimony are both restrained ... from compelling self-incrimination"), *cert. denied,* 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986) [hereinafter *Araneta* ]; *see also United States v. (Under Seal),* 807 F.2d 374, 375–76 (4th Cir.1986) (per curiam) (rejecting the significance of a mutual legal assistance agreement for routine legal matters as showing American participation in a foreign prosecution); *In re Parker,* 411 F.2d 1067, 1069–70 (10th Cir. 1969) (holding that Rule 6(e) would prevent disclosure of the witness's testimony to foreign officials, thus negating fear of foreign prosecution and, alternatively, that "the fifth

amendment provides no shelter ... against incrimination in a foreign jurisdiction" where federal domestic immunity has been granted), *vacated as moot sub nom. Parker v. United States,* 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970). Because the question has not been decided by the Supreme Court or by this court, we decide it for the first time in our circuit.

In *Araneta,* the Fourth Circuit rejected application of the privilege in an effort to preserve and protect domestic law enforcement functions.

> Just as comity among nations requires the United States to respect the law enforcement processes of other nations, our own national sovereignty would be compromised if our system of criminal justice were made to depend on the actions of foreign government beyond our control. It would be intolerable to require the United States to forego evidence legitimately within its reach solely because a foreign power could deploy this evidence in a fashion not permitted within this country.

*Araneta,* 794 F.2d at 926. The Tenth Circuit reached a similar conclusion in *In re Parker.* After acknowledging that the trial court had made no specific findings regarding the possibility of the witness's testimony incriminating her in a foreign jurisdiction, the court rejected the Fifth Amendment argument on the basis of protecting domestic law enforcement. It suggested that:

> [t]he ideology of some nations considers failure itself to be a crime and could provide punishment for the failure, apprehension, or admission of a traitorous saboteur acting for such a nation within the United States. In such a case the words "privilege against self-incrimination," engraved

**22.** Although the Tenth Circuit's decision in *In re Parker,* 411 F.2d 1067, 1069–70 (10th Cir.1969), *vacated as moot sub nom. Parker v. United States,* 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970), was vacated, it remains persuasive authority to the Tenth Circuit and we consider it as such.

**23.** The district court focused upon several early English cases and its own interpretation of *Murphy* in determining that the privilege did not apply to foreign prosecutions. Neither *Murphy* nor the English cases cited by the district court unequivocally decide this case. Although we

find it unnecessary to consider the historical significance of these cases in arriving at our decision, the peculiar and inconclusive history of the privilege's possible application to foreign prosecutions is well-documented. *See generally Gecas,* 830 F.Supp. at 1414–21; *Moses,* 779 F.Supp. at 874–82; Comment, *Fear of Foreign Prosecution and the Fifth Amendment,* 58 Iowa L.Rev. 1304, 1307–13 (1973) [hereinafter *Fear of Foreign Prosecution* ]; Note, *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972), 5 Rut.–Cam.L.J. 146, 149–52 (1973).

in our history and law as they are, may turn sour when triggered by the law of a foreign nation.

*Id.* (footnote omitted). Restated, the court's basic hypothesis is that a person who came to the United States, attempted to commit a crime here, but failed, could be subject to prosecution abroad for that failure. If the perpetrator were allowed to invoke the Fifth Amendment in such an instance, the United States would be unable to compel his testimony with respect to the attempted crime, even under a grant of domestic immunity, because the person would fear foreign prosecution. *Accord Phoenix Assurance Co. v. Runck,* 317 N.W.2d 402, 410 (N.D.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982).[24] *But see* Moshe M. Surenik, Note, *Testimony Incriminating Under the Laws of a Foreign Country—Is There a Right to Remain Silent?,* 11 N.Y.U.J.Int'l L. & Pol. 359, 370 (1978) (referring to the *Parker* supposition as a "bizarre and isolated hypothetical").

The district court below engaged in a similar analysis. *Gecas,* 830 F.Supp. at 1422. ("Almost any act, including the act of testifying itself, may be criminal under the laws of some sovereign, somewhere."). The district court concurred with the Fourth and Tenth Circuits that law enforcement in this country should not be circumscribed by a person's fear of prosecution elsewhere. Yet, in the instant case, the priority of this motivation is significantly diminished because OSI also has been investigating Gecas through additional

means. *See supra* Part II(A)(2)(c); *Ragauskas III; Ragauskas II; Ragauskas I.* OSI is proceeding with its investigation of Gecas without Gecas's cooperation; it may well have sufficient evidence without Gecas's testimony to commence deportation proceedings against him.

■ Despite the hypothetical situation posed by the Tenth Circuit and suggested by the district court, we are convinced that requiring the witness to demonstrate a real and substantial fear of foreign prosecution eliminates the apprehension that a person could manufacture a potential for foreign prosecution or raise this specter solely to frustrate domestic law enforcement. This is particularly true if it is unlikely that the witness will be returned to a country which may prosecute him. The *Scaduto* factors provide the court with a measure of materiality of the witness's fear; if the fear is both real and substantial, then protecting the individual, one of the primary purposes of the privilege, supersedes the goals of domestic law enforcement. We find this balance even more cogent where evidence to deport is sought and may be obtained elsewhere.

■ We reject the district court's contention that the privilege protects *only* an individual's freedom from governmental overreaching in domestic law enforcement.[25] The Fifth Amendment privilege against self-incrimination is a personal right; *it is a matter of individual dignity. Trucis,* 89 F.R.D. at 673. Just as the privilege is extended to

24. Finding the reasoning of *Parker* persuasive, the North Dakota Supreme Court concluded that allowing a person to use fear of foreign prosecution as a basis for invoking the Fifth Amendment privilege would put the foreign government "in a superior position than the United States government because its penal laws and the individual desires are given a greater priority than the right of our government to obtain testimony in exchange for a grant of immunity under the laws of this country." *Phoenix Assurance Co.,* 317 N.W.2d at 410. The North Dakota court suggests that the United States enter into treaties with other countries binding them to grant immunity to certain witnesses to the same extent that the United States grants immunity. Consequently, that court concludes that previously unavailable testimony could be compelled while the witness is protected abroad. We find it worth noting, however, that the witnesses in *Phoenix*

*Assurance Co.* did not raise their fear of foreign prosecution when they *testified* initially before the grand jury *or* before immunity was granted; thus, waiving any Fifth Amendment privilege. Hence, the North Dakota court could have decided this case without reaching the constitutional question. Consequently, the persuasiveness of its conclusion is limited.

25. The district court reasoned:

This is not to say that the privilege is blind to the dignity of the individual. It certainly has the effect of preserving the witness's individual privacy. But it does so *only* in the limited context of a criminal prosecution by our federal or state governments, and for the limited purpose of preventing overreaching in the enforcement of our own domestic criminal law. 830 F.Supp. at 1422 (emphasis added).

prevent overzealous prosecution and to constrain the government, the privilege creates in the individual the freedom to remain silent where the testimony may be adverse to his penal interests. One purpose need not eclipse the other in its function. If the court reasonably finds that the fear of foreign prosecution is an actuality rather than a mere speculation, the individual should prevail and be permitted to invoke the privilege. If the prospect of foreign prosecution is pure conjecture, then the importance of domestic law enforcement prevails, and the witness must testify. We believe such a balance both reasonably serves the purposes of the privilege and preserves the goals of domestic law enforcement. As one commentator noted,

> unquestionably, the imprisonment or forfeiture which may result from the compulsion of testimony which would be incriminating in a foreign country is no less penal for its being imposed by another government. Nor would disclosures before domestic bodies be rendered any less 'testimonial' by the fact that incrimination would result under foreign law. Hence theoretical consistency demands that the *Zicarelli* claim give rise to the protection of the fifth amendment's protection against self-incrimination.

*Fear of Foreign Prosecution, supra,* at 1313. Accordingly, we hold that Gecas may assert his privilege against self-incrimination in response to questions which may incriminate him under the laws of a foreign country. *Cf. Ragauskas III,* 1995 WL 86640 at *5–*6 (extending the privilege to Ragauskas for fear of prosecution under Lithuanian law); *United States v. Kirsteins,* No. 87–CV–964, 1990 WL 208722 at *2 (N.D.N.Y. Dec. 3, 1990) (noting earlier decision to extend the privilege); *United States v. Inde,* No. 3–88–0570, at 14 (D.Minn. Aug. 22, 1989) ("The inequity of compelled testimony is not reduced when that testimony is used in a foreign country."); *Trucis,* 89 F.R.D. at 673.

**b. Compelling and Using Sovereigns**

We also note that the Fourth Circuit in *Araneta* may have reached a different conclusion if the United States was not only the compelling sovereign but also the using sovereign.[26] *Araneta,* 794 F.2d at 928. In the instant case, the United States has entered into an agreement with Lithuania to *affirmatively assist it in obtaining information* regarding suspected Nazi collaborators and to *aid it in prosecuting* these people. Memorandum of Understanding Between the United States Department of Justice and the Office of the Procurator General of the Republic of Lithuania Concerning Cooperation in the Pursuit of War Criminals, Aug. 3, 1992, U.S.–Lithuania. Moreover, we are troubled that OSI is using an Article III court to compel testimony which it readily may transfer to a foreign country, particularly Lithuania, for prosecution of Gecas. We find the reasoning in *Moses v. Allard,* 779 F.Supp. 857 (E.D.Mich.1991), persuasive:

> [T]he compelling body is a court of this nation operating under the American Constitution. It is undeniable that the Fifth Amendment applies to this Court. The fact that the information so compelled may be used by a foreign jurisdiction does not exonerate this Court from its constitutional obligations.

*Id.* at 881. Because the district court, as a component of the United States government, would be instrumental in obtaining information promised by OSI to a foreign nation for its use, the United States government would be essentially both the compelling and the using sovereign.

■ A witness retains the right to remain silent until he *either* surrenders that right *or* he can no longer maintain a reasonable belief that he may be subject to criminal prosecution as a result of his testimony. The notion that we may compel Gecas's testimony knowing that it could be used later to convict and to punish him for a crime committed abroad

---

**26.** The compelling sovereign is the government that forces the witness to testify. The using sovereign is the government that then employs the testimony or the evidence derived therefrom to prosecute the witness. These can either be separate sovereigns such as the state and federal governments or they can be the same government such as an independent state.

is offensive to our concept of the Fifth Amendment privilege; it violates one of the two primary principles of the Fifth Amendment: *to protect the individual from an overzealous government.* Where the United States is both the compelling and the using sovereign, all the purposes of the privilege apply and the privilege should be sustained.

The district court, however, held that in instances where the fear of prosecution results from the criminal laws of a foreign country

> none of the purposes of the privilege applies. Any motive to *inflict harm* because of the incriminating nature of the disclosure is absent. Similarly, the sentiments relating to conflicts between *the witness and the government do not apply where the two are not in conflict over potential criminal liability.* Thus, testimony that is incriminating under foreign law is of no more interest to the interrogator than any other information compelled of the witness.

830 F.Supp. at 1422 (footnote omitted) (emphasis added). In view of the circumstances surrounding the effort to depose Gecas, we must reject this argument. If Gecas's testimony is incriminating under the law of Lithuania, then it is exactly the information that OSI is interested in obtaining and providing to Lithuania. Hence, even if the Fifth Amendment is only applicable to foreign prosecutions if the United States is both in effect the compelling and using sovereign as the Fourth Circuit suggested, Gecas nevertheless would be able to assert his Fifth Amendment right against self-incrimination.

Indeed, the concept that an American citizen's [27] Fifth Amendment right depends upon whether he is to be subjected to domestic prosecution, with its manifold due process safeguards, or delivered into the hands of a foreign regime, whose judicial processes *may or may not* comport with the American paradigm of human rights, is repugnant to our nation's historical protection of individual liberties. Moreover, the compulsion brought to bear here is the contempt power of an Article III court—the historical protector of individ-

ual liberties and bulwark against the type of governmental oppression that caused our forefathers to flee some of the same foreign lands to which the OSI now would have us deliver an American resident for prosecution on the basis of his own testimony. While we recognize that Gecas may be deported to and prosecuted by other countries on the basis of evidence gathered elsewhere, we refuse to deny Gecas the fundamental constitutional right to which he is entitled, the right to refuse to incriminate himself.

## C. *Production of Documents*

The Supreme Court has concluded that "the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence but applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976).

> The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [witness]. It also would indicate the [witness's] belief that the papers are those described in the subpoena.

*Id.* at 410, 96 S.Ct. at 1581; *see United States v. Doe,* 465 U.S. 605, 612, 104 S.Ct. 1237, 1242, 79 L.Ed.2d 552 (1984) (noting that act of production may be testimonial); *United States v. Argomaniz,* 925 F.2d 1349, 1356 (11th Cir.1991).

In *Argomaniz,* we held that production of an individual's tax records was testimonial because it authenticated the documents and informed the IRS that the individual had income during the years in question. This information may have been incriminating because taxpayers may be prosecuted criminally for failure to report income. We directed that the documents be produced *in camera* in order for the district court to assess prop-

---

**27.** Just as the Fifth Amendment right against self-incrimination for fear of domestic prosecution applies equally to resident aliens and citizens, *see supra* Part II(A), so the right against self-incrimination for fear of foreign prosecution applies.

erly whether the act of producing the documents would be incriminating. *Id.*

The district court did not separately address any arguments by Gecas or by the government regarding the application of the privilege to the production of documents requested by OSI. Because the district court first must ascertain whether the act of producing those documents is testimonial and incriminating and, thus, covered by the Fifth Amendment, we do not address on appeal the propriety of production of the requested documents.

### D. *Waiver of Fifth Amendment Privilege*

██ The government argues that, even if Gecas would otherwise be entitled to assert his Fifth Amendment privilege against self-incrimination as to the subpoena, because Gecas signed his immigration papers under oath, he has waived his Fifth Amendment privilege as to future communications regarding this issue. Since the district court concluded that Gecas did not have a Fifth Amendment privilege, it did not reach this issue. Our holding that Gecas may assert the privilege requires the district court to determine on remand whether Gecas, by virtue of his immigration application or other acts, waived his privilege against self-incrimination.

### III. CONCLUSION

If a witness possesses a real and substantial fear of foreign prosecution, he may assert his Fifth Amendment privilege against self-incrimination to avoid testifying about information which can be used against him in a later criminal prosecution. The Constitution's protection of the individual, as embodied in the Fifth Amendment, prevents requiring him to provide evidence which may allow a foreign government to prosecute him. Gecas possesses a real and substantial fear of foreign prosecution and, thus, can assert his Fifth Amendment privilege as to that testimony which may tend to incriminate him. We AFFIRM the district court's finding that Gecas possessed a real and substantial fear of foreign prosecution, REVERSE the district court's legal determination that Gecas could not assert the Fifth Amendment privilege against self-incrimination and REMAND this case to the district court for proceedings consistent with this opinion.